**MONOVIS, INC. and Bernard Zimmern, Plaintiffs,**

v.

**Giovanni AQUINO and Aurora Technology Corporation, Defendants,**

**Dresser–Rand Company, Plaintiff–Intervenor.**

No. 89–CV–0316E.

United States District Court, W.D. New York.

March 21, 1994.

Robert F. Fink, New York City, Joseph A. Podwika, Buffalo, NY, for Plaintiff.

James D. Gauthier, Buffalo, NY, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

ELFVIN, District Judge.

This is an action seeking equitable and non-monetary redress for a wrongful misappropriation of "trade secrets" allegedly belonging to plaintiff Zimmern and pertaining to the design and manufacture of single-screw compressors.[1] Zimmern had licensed his accumulated knowledge of single-screw compressors to companies in various parts of the world. Plaintiff Monovis, Inc. ("Monovis") is Zimmern's exclusive licensee in the United States and it, in turn, has entered into sublicense agreements with companies in this country. Defendant Aquino was an employee of such a sublicensee company and, through his employment, was exposed to and worked with Zimmern's claimed trade secrets and, allegedly, is subject to a continuing duty not to disclose them. Aquino and another—Ewan Choroszylow—formed defendant Aurora Technology Corporation ("ATC") in 1987 and have endeavored to engage in the business of designing, manufacturing and selling single-screw compressors and their parts.

The Complaint for trade secret misappropriation and for breach of the duty of nondisclosure was answered by the defendants who asserted counterclaims sounding in unfair competition and antitrust and have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Such motion was based in part on Aquino's sworn affidavit that he had designed a single-screw compressor prior to the time that his then employer, the Worthington Group, a division of McGraw–Edison Company ("Worthington" or "McGraw–Edison"), had received any of Zimmern's alleged proprietary trade secrets.[2] After the serving and filing of said motion Dresser–Rand Company ("Dresser–Rand"), a successor in title and in interest to Worthington, moved to intervene, arguing that any invention or innovation devised by Aquino during his employment by Worthington and Dresser–Rand is the property of Dresser–Rand by virtue of assignments he had executed. Over the defendants' opposition, Dresser–Rand was granted leave to intervene.

This Court, after the case had been reassigned, issued an Order consolidating the hearing of a motion by the plaintiffs for a preliminary injunction with the trial on the merits of the prayer for a permanent injunction.[3] The trial was lengthy and oft-interrupted and was followed by proposed findings of fact and proposed conclusions of law and supporting briefs[4] and oral argument.

1. This Court is vested with subject matter jurisdiction over the action by virtue of the diversity of citizenship of the parties. *See* 28 U.S.C. § 1332. Plaintiff Zimmern resides in Connecticut and plaintiff Monovis, Inc. is a Connecticut corporation with its principal office in that state. Defendant Aquino is a New York resident and defendant Aurora Technology Corporation is a New York corporation with its principal place of business in New York.

2. The Hon. John T. Curtin, a judge of this Court to whom this case was previously assigned, ordered the defendants' motion for summary judgment adjourned and it was not pursued further.

3. Such Order also denied (without prejudice) the plaintiffs' and plaintiff-intervenor's motion to dismiss the defendants' abovenoted counterclaims, but stayed discovery pertaining to such counterclaims and directed that they be tried separately from the plaintiffs' and plaintiff-intervenor's claims.

4. *See* Plaintiffs' and Plaintiff–Intervenor's Post–Trial Memorandum (filed February 18, 1992) ("Plaintiffs' Memorandum"), Plaintiffs' and Plaintiff–Intervenor's Proposed Findings of Fact and Conclusions of Law (filed February 18, 1992) ("Plaintiffs' Proposed Findings and Conclusions"), Post–Trial Memorandum of Law of Giovanni Aquino and Aurora Technology Corporation (filed February 18, 1992) ("Defendants' Memorandum"), Proposed Findings of Fact and Conclusions of Law (filed by defendants February 18, 1992) ("Defendants' Proposed Findings and Conclusions"), Plaintiffs' and Plaintiff–Inter-

The United States Navy ("the Navy") became interested in obtaining single-screw compressor capabilities for its underwater craft and began discussing the possibility of Worthington's providing such technology and product. According to John Brown, formerly a Vice–President of Engineering at Worthington, that company had begun discussing such machinery with the Navy in late 1980 or early 1981. Brown (9/11/91) 11.[5] He testified that the Navy then was in the process of evaluating and comparing five or six different types of "positive displacement compressors" to determine which was best-suited for its future needs and that the decision was made at Worthington to have someone learn about "this technology" to facilitate further discussions with the Navy. *Id.* at 11–12. Brown stated that, "somewhere in that general time frame" (1980–1981), there were indications that the Navy would issue a request for proposals from companies interested in developing a single-screw compressor technology. He selected Aquino, then a Worthington employee, for such task and responsibility.[6] *Ibid.* Aquino performed some preliminary work and evaluations of such machines. Among such endeavors, he undertook and accomplished a technical evaluation of Zimmern's single-screw compressor."[7] Aquino recommended that Worthington rely on Zimmern's single-screw expertise.

Worthington was awarded a single-screw compressor contract by the Navy in November of 1983 and Aquino was named the manager for the project, known as "the Star Project."[8] Worthington eventually entered into a sublicense agreement with Monovis. Worthington and its employees (including Aquino) who were to be exposed to Zimmern's information agreed to hold it in confidence. Zimmern's advice and knowledge were received by Worthington in due course and as work on the Star Project proceeded. Numerous meetings were held from 1983 through 1986 at which Zimmern and/or his representatives discussed all aspects of single-screw technology with Worthington's employees; Aquino was often present at such meetings.

Worthington's Buffalo plant closed in 1987 and work on the Star Project was transferred to a facility of the new owner Dresser–Rand in Painted Post, N.Y.

Choroszylow, a Worthington employee and Aquino's associate-to-be in ATC, resigned from employment with Dresser–Rand August 24, 1987 (effective as of September 4th). Plaintiff's Exh. 302. Ten days earlier and while Aquino was still associated with Dresser–Rand, Aquino and Choroszylow however had travelled to Cooper Industries's Gardner–Denver Industrial Machinery Division in Quincy, Ill. ("Cooper") to discuss the possibility of their providing single-screw technology to Cooper. Following his resignation from Dresser–Rand, Choroszylow began setting up ATC which was formally incorporated that October. He commenced actively marketing the new company's claimed expertise in single-screw compressor technology and capability. Such marketing efforts were directed toward Cooper and numerous other companies.

Aquino was offered a job at Dresser–Rand in Painted Post when the Buffalo plant closed, but he rejected the offer. Aquino

venor's Post–Trial Reply Memorandum (filed March 9, 1992) ("Plaintiffs' Reply Memorandum"), Reply to Defendants' Proposed Findings of Fact and Conclusions of Law (filed March 9, 1992), Defendant's [sic] Response to Plaintiffs'/Intervenors [sic] Proposed Findings of Fact and Conclusions of Law (filed March 9, 1992), Defendant's [sic] Reply/Response to Plaintiffs' Post–Trial Memorandum (filed March 9, 1992) ("Defendants' Reply Memorandum").

5. References to the trial transcript will be made by stating the surname of the witness, followed by the date the testimony was given, followed by the page numbers from the transcript of that day's proceedings.

References to deposition testimony will be made by stating the surname of the witness, followed by the letters "Tr.", followed by a page number.

6. Brown regards Aquino as "probably the most creative and trained, intuitive Engineer that I know." Brown (9/11/91) 13.

7. Plaintiffs' Exh. 9. It is entitled "THE ZIMMERN SINGLE SCREW COMPRESSOR/A PRELIMINARY TECHNICAL EVALUATION/JUNE 1981 Prepared By: G. Aquino."

8. "STAR" is the Navy's acronym for Screw Technology Advanced Rotary.

(3/27/91) 565–567. Instead, Aquino entered into a "Consultant Agreement"[9] with Dresser–Rand in early June of 1987 for the purpose of inculcating its engineers with his own accumulated knowledge of the Star Project. *See* Plaintiffs' Exhs. 28, 29.[10] Aquino was considered "the expert" on single-screw compressors in the company. Aquino (3/25/91) 156–157. The Consultant Agreement contains an assignment-of-inventions clause, pursuant to which Aquino agreed to assign to Dresser–Rand any inventions he conceived which related to his duties thereunder.[11]

Aquino worked as a consultant for Dresser–Rand through October 1987. Aquino (3/29/91) 879.

Within a month of the announcement of the Worthington plant's closing, Brown had secured a position as Director of Engineering at Cooper.[12] He testified that his background in single-screw compressors at Worthington was surely a factor in Cooper's decision to hire him,[13] inasmuch as Cooper had an interest in developing such a machine. Brown (9/11/91) 92–93. Around the time Brown left Worthington he advised fellow employees Ralph Coleman and George Saf-

ford that Cooper was hiring and that, if they were interested, they should apply. Once at Cooper, Brown had the ability to hire people into his department, which fluctuated in number from fifty to eighty employees. *Id.* at 79. Coleman and Safford applied for positions with Cooper and offers of employment were extended to and accepted by them in short order. *See* Plaintiffs' Exhs. 46, 47 (letters dated April 24, 1987 from Brown extending offers on Cooper's behalf to Coleman and Safford, respectively); Plaintiffs' Exhs. 48, 49 (letters from Coleman and Safford, dated May 6 and May 1, 1987, respectively, accepting the offers).

Aquino commenced working at ATC November 2, 1987, following his work at Dresser–Rand under the Consultant Agreement. On November 4, 1987 Choroszylow wrote Coleman at Cooper, providing him with detailed cost estimates of the manufacturing tool ATC proposed to use to fabricate the rotor of a single-screw compressor. Aquino claims he had conceived of such manufacturing device and method on November 2 or 3, 1987.

---

**9.** Evidently, the Consultant Agreement signed by Aquino (Plaintiffs' Exh. 29) did not include a Schedule "A" describing the services to be performed by him as a consultant. Aquino (3/25/91) 148–149. Hence, Plaintiffs' Exh. 28, a copy of the Consultant Agreement with a Schedule "A" was also received in evidence. In any event, Aquino testified that he was alerted to the absence of Schedule "A" from the agreement at that time he signed it, that his duties under the agreement were explained to him at the time he signed and that such explanation was in substance equivalent to that found in Schedule "A". *Id.* at 149.

**10.** Aquino transferred such information principally to Dresser–Rand employee Scott Hand and, to a lesser extent, to Wayne Wehber and John Sawyer. Aquino (3/25/91) 140–141.

**11.** Part 9 of the Consultant Agreement addressed "Inventions" as follows:

"a. Consultant shall assign to D–R [Dresser–Rand] and hereby does assign to D–R his entire right, title and interest in and to any and all inventions, discoveries, improvements and developments whether or not patentable and whether individually or jointly made relating to duties performed by Consultant under this Agreement.

"b. Consultant shall promptly disclose to D–R each invention, discovery, improvement and development relating to duties performed and execute, acknowledge and deliver to D–R, without charge to D–R but at D–R's expense, any and all papers which may be required or desirable for obtaining patents whereon [sic] in any and all countries and for vesting title thereof in D–R or such other legal entity as D–R may designate." Plaintiffs' Exh. 29.

**12.** Brown had been informed in December 1986 "that there would be no job for me at the same level and no job at any other level" at Dresser–Rand. Brown (9/11/91) 55. Brown testified that, at a subsequent staff meeting in January 1987, "there was a fairly heated discussion about the information which was being circulated in the business and who would have jobs and who would not and various other similar matters and I was arguing fairly strenuously to represent our people fairly and to tell them the truth in a timely fashion, and I was asked to leave." *Id.* at 56. Brown was then escorted out of the plant by a personnel director. *Id.* at 57.

**13.** The first item listed on Brown's résumé under "Professional Skills and Achievements" was that he had developed a water-lubricated, single-screw compressor. Plaintiffs' Exh. 39.

Aquino's background comprises his having received his education in mechanical engineering at the Polytechnic Institute of the University of Naples in Italy and having started work for Worthington shortly after completing his studies in 1963. On July 6, 1965 Aquino signed an "Agreement for Assignment of Inventions" pursuant to which he agreed to assign to Worthington all his rights in and to any inventions conceived by him during the course of his employment. *See* Plaintiffs' Exh. 8. The agreement also contained a clause addressing and limiting the post-termination use by him of any and all confidential information obtained by him during the course of his employment. Aquino successively held positions as an analytical engineer in the company's Applied Mechanics Department, as a design engineer in its Development Department and as a Senior Analytical Engineer in its Research Department. Plaintiffs' Exh. 89B.

A key point of contention in this case is the quantitative and qualitative significance of the work done by Aquino on the Star Project prior to the issuance to Worthington of the Monovis sublicense and its receipt of Zimmern's "Know–How book." It is the defendants' position that Aquino had designed a single-screw compressor during the Summer and early Fall of 1983 [14] and before receiving any information or other assistance from Zimmern, other than reverse-engineering a single-screw compressor which Worthington had for such purpose purchased from Mitsui–Seiki Company ("Mitsui"), a Zimmern licen-

see, early in 1983. Aquino claims to have accomplished this feat "[u]sing publicly available information, knowledge gleamed [sic] from examining the Mitsui single screw compressor, and consultations with Navy personnel." Defendants' Memorandum, p. 38. The evidence concerning Aquino's efforts prior to Worthington's—and his—receipt of the Zimmern Know–How must be examined in detail.

By June of 1981 Aquino had prepared a "preliminary examination." Therein he recommended that "Zimmern compressors should be pursued for HP [high pressure] and LP [low pressure] Navy compressors * * *." Plaintiffs' Exh. 9, at 1. Such preliminary evaluation was based upon information obtained in a meeting or meetings with individuals at the Navy's "David Taylor Research Center" [15], upon a 1977 Navy report [16] on various types of compressors including Zimmern's single-screw compressor and upon the masters degree thesis of Navy engineer Thomas Bein which he had presented at Purdue University in 1979. *Id.* at 2, 4.

The "preliminary technical evaluation" is aptly characterized. Despite its brevity,[17] the document discusses not only the CP configuration eventually chosen for the Star Project, but also touches on the CC, PC and PP alignments.[18] As a proposal for reducing leakage Aquino suggests, *inter alia,* reducing the running clearances and notes that "[t]his is the simplest method, but it requires manufacturing the parts with very close tolerances which, in turn, would increase the number of rejects." *Id.* at 6. The conclusion that re-

---

**14.** A curious sentence immediately follows such assertion in the defendants' brief:

"In all probability, Giovanni Aquino had completed the design engineering work (conceptual layouts) required for the single screw compressor project by December of 1983, after having met with Navy personnel from time to time in September and October, 1983." Defendants' Memorandum, 38–39.

This Court initially notes the phrase "[i]n all probability" and the lack of certainty it belies. The assertion that Aquino "had completed the design engineering work (conceptual layouts)" is somewhat deceiving. "Conceptual layouts" is an early stage of design work; "detailed design drawings" are the laying-out of the completed product. Finally, the statement as a whole is difficult to square with the immediately preceding assertion that Aquino designed a single-screw

compressor during the Summer and early Fall of 1983.

**15.** The Center is the Navy's research and development facility in Annapolis, Md. *See* footnote 23, *infra.*

**16.** This report was sometimes referred to as the "Thalen Report." See Aquino (4/15/91) 895. It was not received in evidence.

**17.** Seven numbered pages plus a four-page appendix.

**18.** The letters "CP" denote "cylindrical planar," referring to a cylindrical screw and planar gaterotors. "CC" refers to a cylindrical screw with cylindrical gaterotors, "PC" refers to a planar screw with cylindrical gaterotors and "PP" refers to a planar screw with planar gaterotors.

ducing the clearances between the moving parts of a compressor decreases leakage and thereby increases efficiency is an elementary and obvious one. See Zimmern (3/15/91) 192–193 ("every designer in the world would try to do that"). The preliminary evaluation depicts Worthington at the earliest stages of its single-screw compressor program.

Aquino testified that, before writing his preliminary evaluation, he "visited" with Navy personnel and conversationally received some data which "was not 100% correct but qualitatively was correct"; he claims that such information enlightened him as to the "trends" of the Navy's work. Aquino (4/5/91) 898. Aquino also testified that he reviewed Bein's thesis.[19] Aquino (4/15/91) 822. He pointed out at trial the conclusion in Bein's thesis that the single-screw compression process can be modelled as an "isentropic" process.[20] Aquino further testified that, before preparing his preliminary evaluation, he reviewed that portion of Bein's thesis which describes the "supercharging effect" that occurs at a single-screw compressor's intake—Aquino (4/15/91) 833—and that he understood that Zimmern claimed that his own knowledge of these items was a trade secret. Id. at 830, 833–834.

Following this favorable assessment of Zimmern's compressor, Worthington's management decided to pursue a Zimmern sublicense. Loree Paulson, in 1983 the Manager of Marine and Government Operations,[21] explained the decision:

"We knew Zimmern had worked on this machine for many years. We knew that he had probably seen success and failure. We knew that he probably had the basis to help us in our designs. We knew that he had a manufacturing technology.

"Mr. Smidansky [Paulson's boss] asked the manufacturing people to look at this and see if they could develop a machine tool. The report that came back was that it would cost well over a million dollars with no chance of success. They didn't know exactly how to machine this and if they could maintain the accuracy and the fits, and the interchange that was required. So, we felt that for the product technology and the manufacturing technology, Mr. Zimmern had years of experience and something concrete to show that would guarantee success, especially for the navy contract, where we would have to make contractual commitments to certain costs and certain timetables.

"And Mr. Zimmern's license would eliminate a lot of uncertainty and guarantee us success." Paulson (8/23/91) 18–19.

Paulson further testified that, at the time the decision to take a Zimmern sublicense was made, Worthington had no engineers with experience in designing or manufacturing single-screw compressors and reiterated that to attempt either task from scratch would be a lengthy and expensive process with no guarantee of success. Id. at 19–22. Derek Woollatt, in 1983 Worthington's Manager of Research and Development,[22] concurred with Paulson's view, testifying that to develop single-screw technology would take "certainly several years, maybe four to five years" and cost "a few million dollars" and that developing a method to manufacture the screw might have been an additional project. Woollatt (8/29/91) 26.

On March 17, 1982 Worthington employees travelled to the Navy's David Taylor Research Center for a "Pre–Proposal Conference" on single-screw compressors. See Defendants' Exh. 115 (Worthington Trip Report). They were informed that the Navy wanted a "Zimmern approach" to the single-

---

**19.** Following its presentation at Purdue University, Bein's thesis was submitted to and released by the Navy; it was received in evidence in the form released by the Navy. See Plaintiffs' Exh. 219.

**20.** In an isentropic compression, no heat is exchanged between the medium to be compressed and its surroundings. Aquino (4/15/91) 828.

**21.** His responsibilities were primarily in marketing compressor products to the Navy. Paulson (8/23/91) 12. At the time of the testimony, Paulson was employed at Dresser–Rand as Vice President of Government Products for the Engine Process Compressor Division. Id. at 4–5.

**22.** It was part of his job to formulate cost and time estimates for new projects. Woollatt (8/29/91) 26. At the time of his testimony, he was Manager of Advanced Engineering at Dresser–Rand. Id. at 5.

screw compressor and that bidders were encouraged to take a Zimmern license, but that such was not mandatory, provided that a bidder not possessing a Zimmern license could prove single-screw capability. *Id.* p. 4.

By May 14, 1982 Worthington had prepared and submitted to the Naval Sea Systems Command a "PROPOSAL FOR A SINGLE–SCREW AIR COMPRESSOR DESIGN AND DEVELOPMENT PROGRAM." Defendants' Exh. 326. The proposal is replete with references to Zimmern and his technology. It begins:

"Worthington has defined a program for the design and development of single-screw air compressors (SSAC) to meet the U.S. Navy's low- and high-pressure air requirements. We will use the basic technology developed by Mr. B. Zimmern and the DTNSRDC [23] to design and develop a low pressure (9.5 atm) SSAC unit and will build and test two prototypes before delivering a unit to the US Navy." Defendants' Exh. 326, p. 1–1.

The proposal then discusses Worthington's plan to procure a Zimmern license:

"Having duly noted the potential advantages that the Zimmern single-screw compressor offer [sic] for shipboard use, Worthington has for more than a year been negotiating a non-exclusive license agreement with Mr. Zimmern. * * * *The agreement is essential to Worthington's participation in the future of the single-screw compressor technology,* and with it we are confident that we can undertake and complete the program described herein to the US Navy's full satisfaction. The license agreement itself, and a satellite agreement devised especially for this program, will provide all the technical assistance from Mr. Zimmern and his staff that can reasonably be expected of a licensor. For the low-pressure (LP) prototype, *Mr. Zimmern will manufacture the mainrotor and the (planar) gaterotors and he will supply the design drawings and manufac-*

*turing techniques for these components* * * *." *Ibid.* (Emphasis added.)

The technical section of Worthington's proposal to the Navy was prepared by Aquino. Aquino (4/16/91) 933–935. It clearly reveals Worthington's intention to rely on Zimmern for technical information pertaining to the design and manufacture of the single-screw compressor. For example, it states that "[t]he basic technical data required to design and build a single-screw air end will be available to Worthington through its pending license agreement with Monovis, which is owned and controlled by Mr. Bernard Zimmern." Defendants' Exh. 326, p. 2–6; *see also id.* p. 2–5.

The parties disagree as to how much work was done on the Star Project between the submission of Worthington's proposal to the Navy in May of 1982 and the award of the Navy contract in November of 1983. Brown testified that Worthington's marketing people received early indications from the Navy that Worthington's bid was the most "responsive," leading them to believe Worthington would be awarded the contract. Brown (9/11/91) 20. Brown stated that he met with Worthington management in mid–1983 and that they decided to get a team in place and "get a jump on the project." *Ibid.* The plaintiffs acknowledge Worthington's substantial interest in the Navy contract and the considerable time that went into preparing its proposal. Plaintiffs' Memorandum, p. 59. They argue, however, that there was little incentive for Worthington to proceed with the project in the time between preparation of its bid and the contract award because it would not be paid for such work should the award not materialize. *Ibid.;* Paulson (8/28/91) 257–258; Brown (8/12/91) 227–228.

Starting in May or June of 1983, Aquino developed a computer program to assist him in the design and analysis of the single-screw compressor. Aquino (4/16/91) 1004. Zimmern testified that Aquino's program performs the types of calculations Zimmern was doing by hand in 1962, before he built his

---

**23.** "DTNSRDC" is a shorthand reference to the David Taylor Naval Station Research and Devel-

first compressors.[24] Zimmern (3/12/91) 234. Furthermore, Zimmern testified in detail why he considers that computer models for studying leakage paths in single-screw compressors, such as described in Bein's thesis, are less helpful than some designers believe. For example, Zimmern testified that to assess leakage accurately at any point in the compressor an engineer must know what is leaking—gas, liquid or a mixture of the two. Bein's computer model, Zimmern said, does not take this into account. Zimmern (3/12/91) 253–254. Also, there is a difference between the clearances in a machine when it is sitting idle and the "running clearances" due to the various forces that come into being when the machine is in motion. Bein's computer model does not take such differences into account. Zimmern's approach to evaluating leakage is to "test, test, test." Zimmern (3/12/91) 256–257. Zimmern conceded that computer programs are helpful and even indispensable in confronting some design problems, but contended that they do not solve all of a designer's problems. *Id.* at 257; *see also* Paulson (8/23/91) 67 (responding in the negative when asked whether it was possible for Aquino to have designed the Star compressor from his computer program).

The purchased Mitsui unit was disassembled and some measurements taken therefrom by Aquino and recorded on six pages of hand-drawn sketches. *See* Defendants' Exh. 49. The measurements pertain to the bearing housing for the gaterotor shaft, the screw rotor, the gaterotor support and gaterotor, the drive-end view of the main housing and a cross section of the housing. *Ibid.;* Aquino (4/14/91) 993–1001. Aquino testified that during 1983 the Mitsui compressor was run

for 1,000 hours but was subjected to monitored testing for only thirty-five hours. Aquino (3/28/91) 730–731; *see also* Defendants' Exh. 57. Aquino's measurements of the Mitsui machine did not provide Worthington with sufficient information to fabricate a single-screw compressor.[25] Omitted from Aquino's list were the location, size and shape of the discharge port, the existence of a gaterotor contact line, the gaterotor pin, the floating pin angle [26], the contact line on the screw groove, the width of the screw groove, the angle of cooperation, the changing angles on the sides of the screw groove, critical tolerances [27], the perpendicularity of the gaterotor and screw axes, the concentricity requirements of the gaterotor on its shaft and of the screw on its shaft, the existence of a plenum chamber, the types of materials and their finishes and the labyrinth seal on the screw. Paulson (8/28/91) 246–252. In sum, the measurements provide some dimensions but fall far short of a sufficiently detailed description of a single-screw compressor. *Id.* at 251–252. For instance, Aquino's measurements did not include critical clearances between certain moving parts which clearance, according to Paulson, are "virtually impossible" to measure because certain regions of an assembled compressor cannot be accessed with a measuring device. *Id.* at 243–245. Furthermore, even if such clearances were discernible, it is impossible to determine the dimensional tolerances on any part by looking at a single machine, because a tolerance is a range of acceptable dimensions. *Id.* at 245. *See also* Wehber (8/30/91) 49. Finally, it should be noted that the Mitsui unit examined at Worthington was of a smaller size than the Star compressor, so

opment Center. *See* footnote 15, *supra.*

**24.** Such calculations are used to determine the angles of the slopes in the screw and of the sides of the teeth of the gaterotor, to design a roll-out of the screw (the image that the outside grooves of the screw would produce if dipped in ink and rolled on a piece of paper) and to determine the swept volume of the groove (the volume of the inside of the engaged groove). Zimmern (3/12/91) 235.

**25.** This result is hardly surprising; if successfully designing a single-screw compressor were as

easy as obtaining a working unit from a Zimmern licensee and measuring its parts, no company would be expected to pay for a Zimmern license. *See* text, *infra,* re tolerances.

**26.** A floating gaterotor pin was used in both the Mitsui and the Star compressors. Paulson (8/28/91) 248.

**27.** Such as the tolerances for the contact line on the screw groove, the screw groove width, the gaterotor tooth width, the outside diameter of the screw, the gaterotor outside dimension and the inside diameter of the casing bore.

that even the dimensions of the Mitsui parts that were accurately measurable might well not be readily transferable to the Star.

Aquino also claims to have divined the existence of the contact line on the gaterotor by studying the Mitsui compressor. He testified that, when a gaterotor in the Mitsui unit broke in the Spring of 1983, he took it out of the machine and looked at it on a comparator [28] and observed a contact line, "even though the contacted area was a little worn out." [29] Aquino (4/16/91) 1014–1015. Aquino also says he saw contact lines on gaterotors when he visited the Navy laboratory. *Id.* at 980. Finally, Aquino stated that he had observed a contact line on a drawing of a gaterotor tooth in a patent issued to Zimmern January 13, 1976.[30]

Aquino's explanation of gaterotor shapes in the technical proposal to the Navy implies that he did not then know of the existence of contact lines—despite his claim at trial that he did—or was for some unexplained reason not divulging his knowledge re such. His diagram of the "Present Gaterotor Design" depicts a gaterotor " 'Rounded' From Wear Due To Vibration And Stopping (Observed On Test Compressor)." Defendants' Exh. 326, p. 2–40. It also shows with dashed lines a "Corner In New Condition" without a contact line.[31] *Ibid.* Whether or not Aquino knew of contact lines, his "Proposed Gaterotor Design" featured gaterotors with "curved side faces"—*id.* pp. 2–40 & 2–41. The approach suggested in Zimmern's patent is not the trade secret approach Zimmern here claims has been misappropriated.

There was much evidence and testimony concerning technical drawings of the Star compressor prepared by Aquino prior to his receipt of Zimmern's Know–How. While it is clear that some such drafting was done in that time frame, it is equally clear that Aquino did not have a single-screw compressor designed with precision "on paper." To appreciate this fact, an understanding of the steps in the drafting process is required. Preliminary or layout or conceptual drawings are the first step; generally speaking, they are used to orient the various parts of a machine in relation to one another and to begin to plot the machine's overall architecture. Such drawings lack critical information such as tolerances and clearances which are supplied later in detailed design drawings. The latter are intended to convey enough information to permit the manufacture of parts and the assembly thereof into a working machine. *See, e.g.,* Armbruster (9/13/91) 113–114.

Zimmern's Know–How book had been received at Worthington, about mid-December of 1983 and Aquino by then may have prepared some preliminary or layout drawings, but he clearly had not advanced to detailed design drawings. *See* Defendants' Proposed Finding of Fact 137 (Aquino's *layout drawings* "essentially complete" when Zimmern Know–How received; next step was to go to "detailed design and working drawings to make components"); *id.* 138 (*layout design work* "pretty well finished" before anything received from Zimmern). Furthermore, even the layout drawings prepared by Aquino described a machine with a 196 millimeter ("mm") screw and 196 mm gaterotor and later a 178 mm screw with a 184 mm gaterotor.[32]

---

28. A device used to make an enlarged projection of a part in order to study its dimensions.

29. The fact that the gaterotor examined by Aquino was worn is explained by the fact that it had been run in a machine for "a few hours," that is, "30, 40 or 50 hours." Aquino (4/16/91) 1020. The defendants attempted to replicate at trial what Aquino says he observed in 1983 by introducing a photograph of a new gaterotor placed on a comparator. *See* Defendants' Exh. 373; Aquino (4/16/91) 1019. The exhibit is of negligible evidentiary value because it does not depict the gaterotor Aquino observed or one that had been subjected to a comparable amount of wear.

30. This is United States Patent No. 3,932,077. Plaintiffs' Exh. 251. It does contain a prior art drawing depicting a gaterotor tooth with contact lines on its flanks. *Id.,* fig. 2.

31. Aquino sought to explain the dashed lines as something which had been added to the drawing by "experts," that is, by "people who knew how to present proposals to the government." Aquino (4/24/91) 2400–2401.

32. Aquino changed the sizing of the main rotor or "screw" after the Navy decided that it wanted the low pressure compressor to produce 200 cubic feet per minute ("cfm") instead of 100 cfm.

It is the defendants' position that Aquino's layout drawings could have easily been converted to detailed design drawings from which a single-screw compressor could have been manufactured and that such could have been accomplished without Zimmern's help. *See* Defendants Proposed Finding of Fact 134. In support of this assertion, the defendants point to the deposition testimony of Coleman (Coleman did not testify personally at trial) that "clearances could be established by reverse engineering of a single-screw compressor."[33] Defendants' Proposed Finding of Fact 135. Coleman also testified that, once Aquino had prepared the layout drawings, any further information required to convert them to detailed design drawings would "pop out" automatically. Coleman Tr. 57–58. Evidently, what Coleman was referring to was that tolerances are sometimes selected as a matter of "common sense engineering," or by consulting tables in an engineering handbook or by reference to "industry standards." For example, draftsman Raymond Armbruster testified that tolerances can be determined based on experience with previous jobs or studying similar drawings. Armbruster (9/13/91) 112–114. He further testified that clearances of two to three thousandths of an inch are common in the compressor industry. *Id.* at 127. The defendants thus note triumphantly that Zimmern cannot claim a monopoly on the use of certain clearances. Such attempt to demystify the clearances and tolerances of the Star compressor in this manner fails, however, because no one at Worthington had had any prior experience working with *single-screw*

compressors.[34] Knowledge of the clearances and tolerances used in other types of compressors does not readily translate to such for single-screw compressors, in part because a novel machine tool must be employed to fabricate the main rotor. In such compressors, Zimmern *is* the industry standard, for the simple fact that no one without his help has ever built one that worked. By way of example, Zimmern testified that the tolerance on the groove width

"* * * is something that I believe only us and our licensees know about because to be able to establish those tolerances, you have to be able to machine and as the machining is not that easy and there's a lot of constraints that you will see, you try to do your best and, in fact, the knowledge of the tolerance you can achieve come [sic] from experiment from results, not from just your will. So, the practical tolerance you can put on a drawing comes from experience and not from wish, so they are not common engineering practice. You cannot find them in any book nor in any course." Zimmern (3/12/91) 345.

In sum, the evidence indicates that Aquino began studying single-screw compressors before Zimmern's help was received, but fails to support the defendants' contention that Aquino had successfully and completely designed, or had brought his technical knowledge to the point where he could design, a working single-screw compressor prior to the receipt of Zimmern's Know–How. His preliminary evaluation, with its recommendation that a Zimmern license be pursued, the de-

---

The defendants point out that, in addition to his work on the preliminary layout drawings for the Star compressor, Aquino in October of 1983 redesigned the bearing system of the Mitsui unit for resale to the Hamilton Standard Company. The work consisted of converting the bearings from oil-lubricated to water-flooded. Brown (9/11/91) 22–25. This work is allegedly reflected in detailed design drawings introduced into evidence as Defendants' Exhibits 266, 384 and 388, all dated in October 1983. As far as this Court is aware, the plaintiffs make no claim concerning this bearing design.

33. Significantly, he did not testify that the clearances for the Star compressor *were* determined in this manner. Also, such does not concern tolerances as distinguished from clearances.

34. Aquino had testified in a deposition that he had determined that the clearance between the gaterotor tooth and the groove in the Mitsui unit was ten mils. Aquino (3/27/91) 582. Nevertheless, Aquino decided to use a clearance of [Redacted] between the tooth and the groove in the Star. *Ibid.* At trial he testified that he had decided on the [Redacted] clearance based on his study of the Bein thesis. *Id.* at 581. At his deposition he was asked whether he relied on anything in particular in arriving at the [Redacted] clearance and replied, "nothing specific." *Id.* at 583. See footnote 69, *supra*. [Editor's Note: Certain portions of the original Findings of Fact, Conclusions of Law and Order have been redacted by the Court for publication purposes. See footnote 69.]

scriptions of the decision to seek Zimmern's aid, and the proposal to the Navy all indicate a perception at Worthington that Zimmern's assistance was critical to success. If Aquino had had as firm a handle on the situation as he claims, there would have been no need for Worthington to pay for a Zimmern license. Aquino may have completed on his own some preliminary design layouts and taken some general measurements from the Mitsui compressor, but he had produced neither detailed design drawings nor a machine tool, and he certainly had not built a working prototype. In short, Aquino had not provided Worthington with a single-screw compressor in 1983. The Star compressor was designed and developed into a working machine over the ensuing years, with Zimmern's help.

Zimmern had received his formal education in France, studying physics, mathematics, mechanics and business. He began to work on the development of a single-screw compressor around 1962. At that time he was employed by Cegos, a French management consulting firm, so he was limited to working on his single-screw compressor on Saturdays, Sundays, during vacation time and sometimes at night. In 1971 Zimmern reached the point of having to choose between continuing at Cegos or working full time on single-screw compressors; he chose the latter. Zimmern (3/11/91) 85. Zimmern set up his own company, Omphale, in Paris. He thereafter devoted all of his time to the development of single-screw technology and has thus been working on single-screw compressors for roughly the last thirty years. Zimmern (3/11/91) 86.

Zimmern does not claim to be the "inventor" of the single-screw compressor. He credits past scientists such as DaVinci and Archimedes with the initial concepts underlying the screw. What he does claim responsibility for is solving the hundreds of practical problems encountered in actually building a working single-screw compressor, as opposed to merely appreciating the possibility in general or theoretical terms. Zimmern's account of the years he has spent developing the single-screw compressor supports his view of his contribution. Beginning in 1961 and working with his father, Zimmern took approximately one year to design on paper a single-screw compressor that he thought should be successful. He approached various companies with his plans, "and the reply was always, oh, it's interesting, it's remarkable but something shouldn't work." Zimmern (3/11/91) 121. Zimmern concluded that he would have to make a working model. With a grant from the French government, he and his father built a single-screw compressor. It took them a year and a half to make the machine run for a sufficient period of time (a few hours) to allow for a demonstration to Peugeot, a French automobile manufacturer. Peugeot was sufficiently impressed with the machine that it obtained a license to use the technology. Zimmern and Peugeot then worked to improve the machine he had built. Zimmern (3/11/91) 119–122. The first machine Peugeot designed under its license with Zimmern was unsuccessful; it ran for less than thirty seconds before it seized. Peugeot and Zimmern worked through many variations of the machine over a period of three years before Peugeot achieved a marketable result. Zimmern (3/11/91) 122.

In 1969, Zimmern issued a license to Chicago Pneumatic, a United States company. He continued to develop, improve and refine single-screw technology. Based on the improvements he was making, Zimmern was able to negotiate a license agreement in 1972 with Mitsui. According to Zimmern, Mitsui is presently a major manufacturer in the Japanese market. Zimmern (3/11/91) 122–124. Zimmern's strategy is to work with his licensees to help them achieve their particular goals, while at the same time enriching his own knowledge.[35] Zimmern claims to have spent a minimum of $500,000 per year, and presently about $1 million per year, on research and development and to have employed nine or ten individuals in that regard. Zimmern (3/11/91) 124–125. Such expenditures of money reflect Zimmern's commitment to the testing of his ideas. He testified that "[n]inety-nine percent of the ideas don't

---

**35.** Zimmern licenses contain grant-back provisions pursuant to which technological developments become part of Zimmern's Know–How.

See, e.g., ARTICLE 13 of the Sublicense Agreement, Plaintiffs' Exh. 296.

work and we have three rules in the company for young engineers, rule number one, you test, rule number two, you test, rule number three, you test." Zimmern (3/11/91) 116–117. Testing is time-consuming but, according to Zimmern, absolutely necessary because most new developments fail. Zimmern (3/11/91) 126. In stark contrast to the defendants' view, in Zimmern's eyes the success or failure of a single-screw development is determined in the laboratory, not at the drawing board. Zimmern's efforts to advance single-screw compressor technology, both independently and in cooperation with his licensees, is an ongoing process; the single-screw technology is continually evolving. Zimmern testified that between 1970 and 1991 he achieved a ten to fifteen percent increase in efficiency in the type of single-screw compressor at issue in this case and that such is a "tremendous" amount in the compressor industry. Zimmern (3/11/91) 126–127.

As for the present state of his business, Zimmern testified that companies with sales in the billions of dollars, companies with large engineering departments and compressor engineers of their own, enter into license agreements to obtain his single-screw expertise. Such companies include Mitsui and "Daikin" in Japan and Snyder General, York International and Dresser–Rand in the United States. Zimmern is compensated by down payments and royalties. His annual royalty income is claimed to exceed one million dollars. He asserted that approximately 100,000 single-screw compressors manufactured under Zimmern's licenses are presently operating worldwide and that no company has manufactured and sold single-screw compressors commercially without first obtaining a Zimmern license. Significantly, no evidence was presented disputing his statement that no one has ever built a commercially-

successful single-screw compressor without his help. Zimmern (3/11/91) 136–137.

Zimmern has taken protective measures aimed at insuring that the information he claims as trade secrets will indeed remain undisclosed. His license agreements require the licensees to keep their machine tools [36] in closed rooms with access limited to authorized personnel. Zimmern's Connecticut facility is kept secure and all visitors there are escorted. Viewers of Zimmern's machine tool at that facility—whether they be licensees or potential licensees—must acknowledge in writing that what they see is confidential. Confidential information imparted to licensees at meetings must be acknowledged by the receiving party either at the end of the meeting or within sixty days. Zimmern's Know–How book, which is an extensive compilation of his collected knowledge of the technology of single-screw compressors, is kept confidential. *See* Plaintiffs' Exh. 205 ("THE SINGLE–SCREW COMPRESSOR/CALCULATION AND DESIGN/CONFIDENTIEL [sic]/December 1983"). In addition, as set forth in detail hereinafter, Zimmern's license agreements define the term "Know–How" and delineate the licensees' obligations to protect such; also, employees of a licensee who are to be exposed to Zimmern's Know–How sign confidentiality agreements recognizing the existence of their employer's confidentiality obligations under the license agreement and acknowledging that such obligations extend to them as employees. Zimmern (3/11/91) 140–143.

The sublicense agreement between Worthington and Monovis [37] was finally executed August 30, 1983.[38] *See* Plaintiffs' Exh. 296. In sum, the license agreement stated that Monovis would provide Worthington with Zimmern's single-screw compressor Know–

---

**36.** The screw is fabricated by a specialized piece of equipment—"the machine tool"—which Zimmern claims as one of his trade secrets.

**37.** The sublicense agreement was actually entered into between McGraw–Edison Company (of which company Worthington then was a division) and Monovis, B.V., a Dutch corporation which is Monovis's predecessor.

**38.** McGraw–Edison first signed a Zimmern license in 1982, around the time its technical proposal went to the Navy (May 14, 1982). Paulson (8/23/91) 23. Zimmern did not sign at that time; some changes were made and the revised license was signed by Zimmern August 23, 1983 and by McGraw–Edison August 30, 1983. *Ibid* and Plaintiffs' Exh. 296.

How,[39] to be kept confidential by Worthington, in exchange for a down payment and royalties to Monovis. ARTICLE 6 of the sublicense agreement describes Worthington's obligations relative to the protection of the Know–How.[40] One such obligation was that the managerial personnel of any of Worthington's departments involved in single-screw compressor work certify that they had read key provisions of the agreement, including the provision setting forth Worthington's duty to protect the Know–How, and that they undertake to inform their subordinates of such provisions. Plaintiffs' Exh. 296, Subarticle 6.G(ii). Aquino, who had been assigned as a project engineer for the air-end of the Star compressor—Paulson (8/23/91) 73—, signed such a certification (referred to hereinafter as a "Confidentiality Agreement") September 15, 1983.[41] Plaintiffs' Exh. 238. Aquino's Confidentiality Agreement is in the form of a two-page letter from Paulson to Aquino, who signed and dated it

at the bottom of the last page. Relevant portions of the Confidentiality Agreement are reproduced and discussed hereinafter. Coleman signed a Confidentiality Agreement identical to Aquino's December 6, 1983. Plaintiffs' Exh. 19.

Beginning in early December 1983, Zimmern began providing his Know–How concerning CP single-screw compressors to Worthington and its employees, Aquino included.[42] According to the defendants, Zimmern's Know–How book was received at Worthington on or about December 13, 1983. Defendants' Proposed Finding of Fact 137. The Know–How book is an extensive technical discourse on the design and manufacture of single-screw compressors.[43] Aquino claims that he already had completely designed a single-screw compressor. Thus, Brown testified that, when he briefly reviewed Zimmern's Know–How book on the CP compressor, "[i]t was a big disappoint-

39. "Know–How" is defined in Subarticle 1.E of the license agreement as:
"1. All drawings, specifications, calculations, technical information or other data relating to SSC's [single-screw compressors], including their capacity control, to the processes for machining, checking, assembling and testing them, to the special machines or tooling for manufacturing them, or to any IMPROVEMENT known to or in the possession of MONOVIS which MONOVIS may have or acquire the right to dispose of during the life of this AGREEMENT.
"2. KNOW–HOW shall include only information which is disclosed in a document that is clearly marked confidential or which is identified as confidential during an oral disclosure and is reduced to writing and submitted to McGRAW–EDISON marked confidential within sixty (60) days after the oral disclosure to McGRAW–EDISON.
"3. The KNOW–HOW shall not be deemed to include any information which:
a. is in the public domain or becomes publicly known through no wrongful act on the part of McGRAW–EDISON; or
b. can be proven to have been already known to McGRAW–EDISON at the time of disclosure to it; or
c. is rightfully received by McGRAW–EDISON from a third party who obtained such information lawfully without any obligation of confidence directly or indirectly to MONOVIS, ZIMMERN, Single Screw Compressor, Inc., a Delaware Corporation, with an office at 302 Strawberry Hill Avenue, Norwalk, Connecticut 06851 (hereinafter referred to as SSCI), or OMPHALE, a French

Corporation associated with MONOVIS, with an office at 33 rue Godefroy, 92800 Puteaux, France (hereinafter referred to as 'OMPHALE')."

40. The defendants attach great importance to a grammatical discrepancy between Subarticle 6.E of the license agreement and the parallel provision in the confidentiality agreement signed by Aquino. Such discrepancy is discussed *infra*.

41. After Worthington had been awarded the Navy contract in November 1983, thereby triggering Monovis's duty under the license agreement to supply Know–How relating to CP and PP single screw compressors—Subarticle 5.B of Plaintiffs' Exh. 296—, Aquino on December 5, 1983 re-executed his confidentiality agreement to extend its coverage to CP and PP Know–How. *See* Plaintiffs' Exh. 238, p. 2.

42. As already mentioned, a Zimmern sublicense had been granted to Worthington August 30, 1983. A week later, Worthington had submitted its "best and final" offer to the Navy. *See* Defendants' Exh. 382 (dated September 7, 1983). Worthington had received notice early in November 1983 that it had been awarded the Navy contract. Paulson (8/23/91) 70.

43. The Know–How book was received in evidence as three exhibits: Plaintiffs' Exh. 205 (102–page volume re calculation and design), Plaintiffs' Exh. 205A (five-page description of manufacturing) and Plaintiffs' Exh. 205B ("List of Documents Attached to Know–How").

ment" because he "judged much of the material to be general engineering principles." Brown (9/11/91) 27. Aquino testified that, when Woollatt informed him that the Know–How book had arrived, he told Woollatt he did not have much use for it because he had done what he was "supposed to do." Aquino further testified that he had not even reviewed the book as of January 30, 1984. Aquino (4/17/91) 1285.

The defendants' position is impossible to square with the proof of events both prior— discussed hereinabove—and subsequent to the receipt of Zimmern's assistance. Aquino and others at Worthington were steeped in Zimmern's Know–How after 1983. Such indoctrination was not an exercise in futility; it enabled the company to duplicate successfully and in a short time what Zimmern had taken many years to develop.

As early as December 7, 1983 Aquino and another Worthington employee visited Monovis's "alter ego" corporation Single Screw Compressors, Inc. ("SSCI") in Connecticut.[44] Aquino brought with him a "list of topics we would like to discuss." Defendants' Exh. 51. Ten items were listed; item two was captioned "air end" and listed the following subtopics:

"• SIZING CONSIDERATIONS

"• DESIGN INVOLVEMENT, SCHEDULING & REVIEWS

"• DESIGN INTERFACING WITH WATER LUBRICATED BEARINGS

"• MATERIAL PREFERENCES

"• MANUFACTURING INVOLVEMENTS ON:

"• MAIN ROTOR

"• GATEROTORS & SUPPORTS

"• HOUSING"

According to Aquino, when they arrived at SSCI, the only person there was Sweetser, Monovis's President, who could not answer their questions because he was a "marketing man," not a "technical man." Aquino (4/17/91) 1248. The fact that Aquino still had questions, however, is more probative than whether he received immediate answers.

On January 16, 1984 Aquino, accompanied by Coleman and Paulson, again travelled to SSCI. Paulson testified that they brought Worthington's most recent and up-to-date preliminary layout drawings[45] to the January 16th meeting—Paulson (8/23/91) 88–89— and that these drawings "may have had a few rough dimensions on them, but they did not have any tolerances or clearances" because "we didn't know what some of the clearances and tolerances would be. They were rough layouts, they were conceptual drawings, more of the concept of how we would lay out the machine. We weren't down to that detail yet." *Id.* at 90; *see* Plaintiffs' Exhs. 181, 213. Technical information was given to the Worthington visitors at the meeting. For example, Sweetser testified that, when he had first viewed the drawing identified at trial as Plaintiffs' Exh. 213, he immediately noticed that Worthington was using an outmoded method for connecting the screw to the shaft. The method Worthington proposed was common to the Mitsui units, but had been abandoned by Zimmern in 1980 or 1981. Sweetser informed the Worthington visitors of Zimmern's new method for attaching the screw to the shaft. Sweetser (4/24/91) 2463–2465. In addition, they were shown Zimmern's manufacturing equipment and received an explanation of Zimmern's machine tool, although such was not then in actual operation. *See* Paulson (8/23/91) 76–77; Coleman 333, 434–435; Sweetser (4/25/91)

---

44. *See* footnote 39, *supra.*

45. The defendants attempt to rationalize the paucity of detail contained in the drawings Aquino and other Worthington employees brought to meetings with the plaintiffs on the grounds that a policy decision was made at Worthington not to give Zimmern "interim" information but to wait until everything was complete. *See* Defendants' Proposed Finding of Fact # 163. Aquino testified that, in accord with such policy, he was instructed not to bring his most recent drawings

to some of these meetings. Paulson's testimony that Aquino "absolutely" brought his most recent drawings—Paulson (8/23/91) 90—makes more sense. As he explained it:

"[W]e had a project that we wanted to move along just as fast as we could. So time was of the essence. And we did not hold anything back. We wanted to get as much help as we could from Mr. Zimmern. It was a cooperative effort. And we wanted to do it just as quickly as we could." *Id.* at 89.

2543–2548. Aquino testified that he was not at the meeting. Aquino (3/27/91) 644. Sweetser and Paulson both stated that he was there, and the documentary evidence supports the conclusion that he was. *See* Plaintiffs' Exh. 20 (Coleman's notes with initials "G.A." in list of names); *see also* Plaintiffs' Exh. 147 (Worthington trip report listing Aquino as an attendee); Plaintiffs' Exh. 149A (letter from Sweetser to Paulson verifying that a general explanation of the machine tool was given to Aquino and others). Such evidence weighs strongly in favor of a conclusion that Aquino attended the meeting.

On January 25 and January 30, 1984 Worthington employees again met with the plaintiffs' representatives at SSCI.[46] Aquino prepared a "list of topics which some basic data in Norwalk is required about in order to define the details of the water flooded SSC air end." Defendants' Exh. 58, p. 4. The list included many items related to the assembly of the compressor and the dimensions, clearances and tolerances of its parts. Zimmern was present and dispensed technical advice at both meetings. For example, Zimmern explained his method of so locating the bearing housing with reference to the screw as to insure that the screw is absolutely concentric within its casing. *See* Plaintiffs' Exh. 266A (letter confirming release of such information). Zimmern also examined a Worthington single-screw compressor drawing marked at trial as Defendants' Exh. 279[47]—Zimmern (3/12/91) 227—and recommended that, instead of using a 184 mm gaterotor as in the drawing, a [Redacted][47a] mm gaterotor and screw be used. In addition to noting that the gaterotor was oversized, Zimmern made four other pencilled notations on the drawing, including a suggestion to use plenum chambers. *Id.* at 161; *see* Plaintiffs' Exh. 210; Defendants' Exh. 279. Aquino admits seeing Zimmern's CP machine tool during the January 30th meeting.[48] Aquino (3/27/91) 646–

647. It is noteworthy that Coleman wrote the instructions "read, understand k-how" at the top of his notes of such meeting. *See* Defendants' Exh. 58.

From March 14 through March 16, 1984, Coleman and Aquino were at Omphale in Paris for further meetings with Zimmern. The documents generated in connection with those meetings reflect Zimmern's continued and substantive technical assistance to Worthington. *See* Plaintiffs' Exh. 22 (Coleman's meeting agenda); Plaintiffs' Exh. 183a (Coleman's meeting notes); Plaintiffs' Exh. 258b (description of confidential information disclosed—signed on two sides by Aquino); Defendants' Exh. 35 (Worthington trip report); Defendants' Exh. 73 (March 29, 1984 letter from Zimmern to Coleman describing confidential information disclosed at March meetings). On the whole, the evidence of Zimmern's technical assistance with the Star Project and of Aquino's exposure to Zimmern's Know–How is substantial.

As set forth earlier, Aquino and Choroszylow had travelled to Cooper in Quincy, Ill. for a meeting while Aquino still was working as a consultant to Dresser–Rand and before Choroszylow had submitted his letter of resignation. They met with the former Worthington employees Brown, Coleman and Safford. Aquino testified that he had had no idea prior to the August 14th meeting that single-screw compressors would even be discussed; he said that he had been under the impression that Cooper wanted him to do "just plain engineering work," although he admits that he then had had no idea why a company like Cooper would need his services. Aquino (3/28/91) 792–793. In any event, any confusion as to the purpose of the meeting had been immediately resolved; the sole topic of conversation was single-screw compressor technology. Aquino (3/28/91) 793. Choroszylow testified that Aquino's and his continued relationships with Dresser–

---

46. Coleman attended both meetings. Paulson attended only the January 25th meeting, while Aquino attended only the January 30th meeting. *See* Plaintiffs' Exh. 114 (Worthington trip report).

47. Defendants' Exh. 279 is a photocopy of Plaintiffs' Exh. 210; both were received in evidence.

47a. See footnote 69, *infra*.

48. Aquino was also present at meetings at SSCI on June 11, 1985 and October 22, 1986 at which Zimmern's machine tool, his manufacturing methods for screws and gaterotors and his screw-checking machine were discussed. *See* Plaintiffs' Exhs. 127, 130.

Rand had been a major topic of discussion and concern at the meeting. Choroszylow (8/12/91) 8. Coleman's notes of the meeting reflect such concern with the entry "E.C. aware his existing situation is negative to progress." Plaintiffs' Exh. 53. Despite the concerns over Aquino's and Choroszylow's past and ongoing obligations,[49] the meeting went forward with some discussion of the possibility of Aquino and Choroszylow supplying Cooper with a screw manufacturing technique.[50] Coleman's notes of the meeting contain the entry "Can prep. timetable in next 2 wks on idea of screw fabrication with existing tool." Plaintiffs' Exh. 53. Choroszylow testified that he "may have said that"—Choroszylow (9/12/91) 14—and that he left the meeting "very hopeful that we could have a relationship to start, but we weren't going away feeling it was in the bag, so to speak." Id. 15–16.[51]

As already noted, Aquino's work as a consultant to Dresser–Rand lasted through October 1987. His first day of work at ATC was Monday, November 2, 1987. Aquino (3/29/91) 878. Aquino testified that on that same day or the next day he conceived of the idea for the machine tool he would sell Cooper. Aquino (3/29/91) 911–912. The idea allegedly occurred to him as he was examining a catalog of worm gears. Ibid. Aquino testified that the idea started as an embryo and that he might have worked a few more days to see if it was feasible and could be implemented, but that "once you have an idea, it doesn't take too much to firm it down." Ibid. On November 4, 1987 Choroszylow sent Coleman a detailed cost-esti-

mate for a screw-manufacturing process and a single-screw compressor design. Plaintiffs' Exh. 55.

Although Choroszylow testified that selling single-screw technology was "absolutely not" anywhere on the list of expected activities of the new business, statements of ATC's income for the years 1987, 1988 and 1989 reflect that 100%, 85–90% and roughly 70%, respectively, of the company's income in those years was derived from single-screw compressor activities.[52] Choroszylow (9/12/91) 19.

Just as the evidence belies the defendants' claim that Aquino designed a single-screw compressor at Worthington prior to the receipt of any of Zimmern's Know–How, their claim that their machining process had suddenly occurred to Aquino just after he had severed his ties with Dresser–Rand is contradicted by evidence of events prior to November 1987. First, there is the reference to an "existing tool" in Coleman's notes of the August 14th meeting. Plaintiffs' Exh. 53. Second, Choroszylow and Aquino entered into an agreement with Peter Dooley August 27th pursuant to which they were to communicate to Dooley certain technology they had developed and intended to use in a consulting business, for the purpose of determining whether Dooley could implement such technology. See Plaintiffs' Exh. 51. Under the agreement, Dooley acknowledged that any information revealed to him by Choroszylow and Aquino was to be kept confidential. Ibid. Aquino at trial recalled asking Dooley to keep "our machining process" confidential.

---

**49.** The topic "Obligations" appears on Coleman's agenda for the August 14, 1987 meeting, with no further explanation.

**50.** Choroszylow at first testified that "all we talked about [at the meeting] was the manufacturing technique" but later added that they also "briefly tr[ied] to figure out who was going to design this compressor." Choroszylow (9/12/91) 8, 10.

**51.** Nevertheless, Choroszylow promptly resigned from Dresser–Rand following the August 14th meeting. Upon Choroszylow's departure from Dresser–Rand, Paulson "very excitedly" informed him that he would not be able to go into the single-screw compressor field with Aquino, because Aquino was subject to a confidentiality agreement. Choroszylow (9/12/91) 24; Paulson

(8/23/91) 116–117. Paulson recalled asking Choroszylow what type of work they planned to do and Choroszylow responding that they had a contract to work for NASA. Paulson (8/23/91) 117–118.

**52.** The extent of the efforts expended in marketing ATC's single-screw compressor capabilities bears noting. In addition to negotiating a contract with Cooper, ATC contacted the following entities regarding its abilities in designing and fabricating single-screw compressors: UTC–Carrier, the Navy, Sullair Corp., Areil Corp., Rix Industries, Gas Research Institute and Trane Company. See, e.g., Plaintiffs' Exhs. 89, 93, 95, 97, 98, 100, 312, 313.

Aquino (3/25/91) 179. Choroszylow attempted to explain the agreement with Dooley as pertaining to ATC's plans to work with "regenerative thermal engines," but conceded that "one of the elements" intended to be covered by the agreement was a machine tool for fabricating single-screw compressors. Choroszylow (9/12/91) 36.

On September 5th Choroszylow wrote to Coleman at Cooper, stating:

"As per our last conversation, it was my intent to forward our development proposal following my separation from Dresser–Rand. Since this occurred on September 4th you will shortly receive this document. The proposal will identify milestones for establishing our manufacturing approach and will spell out contract deliverables as understood at this point. Preparatory work will begin on this project in anticipation of both of our needs." Plaintiffs' Exh. 34.

On September 14th Choroszylow again wrote Coleman that "Giovanni and I have mapped out an approach that we believe offers a quick response to the commercial 'window' you foresee with an advanced, heretofore untried, mainrotor machining technique." Plaintiffs' Exh. 54. Choroszylow went on to provide a general outline and cost estimates[53] for providing Cooper with a single-screw manufacturing process and a single-screw design. *Ibid.* Choroszylow spoke with Coleman by telephone September 28th. Coleman's notes indicate that the defendants' process was "not as Z and not recognized by myself," the "Z" obviously denoting Zimmern. On September 30th Coleman wrote Choroszylow, following up on the latter's September 14th letter and their September 28th telephone conversation. On the subject of manufacturing, Coleman synopsized that "[y]ou are very confident that your process will work by adapting an existing machine tool and that the resultant rotors will perform equal to or better than the existing state-of-the-art"[54] and that "you have fairly

well-established contacts with a manufacturer willing and capable of making the necessary tooling and modifications under ATC direction." Plaintiffs' Exh. 56. Coleman also sought assurances that "your process will be satisfactory, meaning equal to or improved over the Zimmern approach." *Ibid.* Choroszylow wrote to Coleman September 30th providing a machine tool cost projection of "$80k for a production quality machine tool." Plaintiffs' Exh. 59. Choroszylow reported that "[t]he machine tool envisioned will be based on a common production tool, modified to perform specialized rotor machining." *Ibid.* A meeting took place between ATC and Cooper representatives October 27th. Aquino testified that he was not present; Choroszylow testified that Aquino was there. *See* Aquino (3/29/91) 900; Choroszylow (9/16/91) 157. It is readily apparent from Coleman's notes of the meeting that the manufacturing process ATC proposed to sell Cooper was discussed. *See* Plaintiffs' Exh. 61. The first entry in the notes under the heading "Manufacturing—Rotor & Gates" is "Uniqueness (vs. Zimmern) if any." The day after this meeting, Brown authored a memorandum indicating that Coleman and he had reviewed ATC's proposed machine tool. *See* Plaintiffs' Exh. 62. Brown indicated that "[t]he approach seems feasible and is sufficiently different than has previously been tried by others that we believe a proprietary position can be achieved by Cooper Industries." *Ibid.* It would, of course, be impossible for Brown to make such an assessment if Aquino, as the defendants claim, had not yet even had his initial "worm gear catalog" inspiration for the machine tool.

Dresser–Rand employees recalled Aquino's discussing his ideas for manufacturing while he was working at Dresser–Rand. Wehber testified that Aquino described Zimmern's manufacturing method, the five-axis milling method,[55] and an idea to "get around" Zimmern's method by adapting a conventional lathe. Wehber (8/30/91) 13–14, 39–44. Paul-

---

**53.** In an apparent reference to Dooley, Choroszylow noted in the September 14th letter that "our machine tool subcontractor" would be able to provide a better estimate in an uncertain area. Plaintiffs' Exh. 54, p. 2.

**54.** Coleman testified at his deposition that by "state-of-the-art" he meant Zimmern's technology. Coleman Tr. 104.

**55.** The employment of five axes.

son testified that in 1985 Aquino had told him about an idea for manufacturing screws "that would have fingers that would shift back and forth. He used his hands, in like a star shape. So, that would shift back and forth and it could be done using an old lathe." Paulson (8/23/91) 102. *See also* Dupler (8/29/91) 9 (recalling between ten and fifteen conversations with Aquino regarding Aquino's idea for manufacturing a screw).

The evidence discussed hereinabove weighs heavily against the defendants' claim that Aquino conceived a manufacturing process via a flash of genius immediately upon severing his ties to Dresser–Rand and arriving at ATC. Aquino had the idea for a machine tool, and Choroszylow had been actively going about selling it to Cooper, before Aquino left Dresser–Rand. This Court concludes from the evidence that the defendants' "flash of genius" account is a ruse designed to avoid Aquino's obligations to plaintiffs.[56]

This Court now turns its attention to the legal standards governing "trade secret" misappropriation. Because subject matter jurisdiction in this case rests on diversity of citizenship, the substantive law of the State of New York must be applied.[57] *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In trade secret cases, New York courts apply the widely-accepted standards of section 757 of the *Restatement of Torts* (1939) ("*The Restatement*"). *See, e.g., Integrated Cash Mgmt. Serv. v. Digital Transactions*, 920 F.2d 171, 173 (2d Cir.1990); *Rodgard Corp. v. Miner Enterprises, Inc.*, 12 U.S.P.Q.2d 1353, 1359–1360, 1989 WL 41727 (W.D.N.Y.1989).

■■■ A party claiming trade secret misappropriation must first show that he in fact possessed a trade secret and, second, that such secret was improperly taken from him. *The Restatement*, § 757; *see Integrated Cash Mgmt. Serv. v. Digital Transactions*, 920 F.2d at 173. Whether the plaintiffs possess protectable trade secrets must be addressed

first; if they did, whether any such were misappropriated will be discussed, although, as will be seen, such inquiries overlap somewhat. *The Restatement's* definition of a trade secret provides, in pertinent part:

"A trade secret may consist of any formula, pattern, device or *compilation of information* which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, *a process of manufacturing*, treating or preserving materials, *a pattern for a machine* or other device, or a list of customers." *The Restatement*, § 757, comment b. (Emphasis added.)

In determining whether one possesses a trade secret, New York courts have relied on the six factors set forth in *The Restatement*:

"(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Ibid.; (quoted in Eagle Comtronics, Inc. v. Pico, Inc.*, 89 A.D.2d 803, 803–804, 453 N.Y.S.2d 470, 472 (4th Dept.1982)).

Secrecy has been identified as the most important consideration among the above factors—*Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 298 (2d Cir.1986)—although, as this Court has itself opined, the fact that a particular trade secret may have been available "in the public domain" does not provide an absolutely safe harbor for one who instead obtains it improperly or from an improper source. *See Rodgard Corp. v. Miner Enterprises, Inc., supra.* *The Restatement* confirms the view that "a substantial element of

---

56. Unfortunately, nothing comparable to the deoxyribonucleic acid test is available to help to determine this type of fatherhood *vel non.*

57. The parties concur that a New York court would in this case apply New York law as op-

posed to the law of the plaintiffs' home state, Connecticut. For this reason, this Court will not engage in an analysis of the choice of New York law over Connecticut law.

secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information." That the secrecy need not be not absolute reflects the theory underlying liability for trade secret misappropriation—to wit, that individuals exposed to trade secrets in confidence ought to be prevented from improperly using or disclosing them.[58]

■ This Court must first decide whether the plaintiffs have proven the existence of trade secrets deserving of protection. Zimmern claims as such a great body of information pertaining to both the design and manufacture of single-screw compressors. At the most general level, the information the plaintiffs seek to protect falls within the categories of information which may qualify for trade-secret status described in *The Restatement:* they pertain to a "compilation of information," "a pattern for a machine" and "a process of manufacturing."

With respect to the six factors *The Restatement* indicates should be considered in determining if trade secrets are present, the first and sixth are hotly contested and will be discussed at length hereinafter. The second factor is the extent to which the claimed trade secret is known by employees and others involved in the plaintiff's business. Not much evidence was received on this point, although the information was obviously known to Zimmern and also to Sweetser and to at least a couple of others.[59] In any event, this Court does not understand the defendants to claim that any trade secret information came into their hands or entered the public domain due to the "loose lips" of any Zimmern employee. This factor must, in this instance, be equated to what was known by those to whom the plaintiffs had granted licenses and by those individuals employed by such licensees.

As for the third factor listed in *The Restatement*, this Court finds that Zimmern has taken substantial steps to maintain the secrecy of his single-screw compressor Know–How. *See supra*, p. 1217. However, his and his company's vast proliferation of the Know–How, albeit under the protective umbrellas of confidentiality-imposing licenses, weighs against their proprietorship. Regarding the fourth factor, the evidence demonstrated the value of the claimed trade secrets to Zimmern (who derived substantial fees from license agreements), to Worthington (which felt that a license from Zimmern was the key to developing, within a tolerable temporal and monetary frame, a working single-screw compressor), to the Navy (which encouraged bidders to take a Zimmern license or else otherwise prove their capabilities), to Cooper (which tried to buy a single-screw compressor from Aquino after he had been exposed to Zimmern's Know–How) and to other Zimmern licensees. Regarding the fifth factor, the evidence further showed that more than twenty years of Zimmern's personal efforts, along with large sums of money, had gone into developing the single-screw technology. *See supra*, pp. 1216–1217.

This Court now examines the evidence as to the first and sixth factors listed in *The Restatement—viz.*, the extent to which the claimed trade secrets are known by parties other than the plaintiffs and the ease or difficulty with which such information could have been acquired or duplicated by others. The defendants assert that the claimed trade secrets are "widely known" outside of Zim-

---

**58.** On this point, *The Restatement* teaches:

"There is considerable discussion in judicial opinions as to the basis of liability for the disclosure or use of another's trade secrets. Analogy is sometimes found in the law of 'literary property,' copyright, patents, trade-marks and unfair competition. The suggestion that one has a right to exclude others from the use of his trade secret because he has a right to property in the idea has been frequently advanced and rejected. The theory that has prevailed is that the protection is afforded only by a general duty of good faith and that the liabili-

ty rests upon breach of this duty; that is, breach of contract, abuse of confidence or impropriety in the method of ascertaining the secret. * * * [Trade secret] protection is not based on a policy of rewarding or otherwise encouraging the development of secret processes or devices. The protection is merely against breach of faith and reprehensible means of learning another's secret." *The Restatement*, § 757, comment (b).

**59.** These others include John Assell and Luc Langouet, who work or worked with Zimmern.

mern's business.[60] The defendants repeatedly emphasize that there can be no trade secret protection for information in the public domain. They then set out to prove that each of Zimmern's individual claimed trade secrets was publicly known. Their argument encounters two obstacles: first, their proof of what is in the public domain is grossly less conclusive than they claim and, second, they have failed to rebut adequately the plaintiffs' position that their most important and over-riding trade secret is the combination of a great many elements of Know–How into a working compressor and a commercially-viable manufacturing process.

Anent what was in the public domain, the defendants' first assertion is that "essentially all" of the items the plaintiffs claim as trade secrets were publicly disclosed by the Navy in research dating back to the mid–1970's. Such is simply not the case. It is true that the Navy was very interested in obtaining single-screw compressors and that its engineers at the David Taylor Research Center made some attempts to develop such "in-house." For example, Navy engineer Wayne Boblitt testified at his deposition that the Navy experimented with a gear-hobbing technique for manufacturing a main rotor. Boblitt Tr. 110. The defendants variously assert that the Navy's technique is "substantially similar" and "identical" to Zimmern's process. See Defendants' Memorandum, pp. 12–13, 15. The defendants further assert

that Navy personnel "may" have provided information on the gear-hobbing process to Aquino. Id. at 14. The intended import of this last implication is evidently not that Aquino got his manufacturing process from the Navy—he claims he conceived of it himself while looking at a worm gear catalog—but rather that the information was released to him and others by the Navy.[61]

More important, however, is the fact that the Navy's gear-hobbing technique did not work. See Boblitt Tr. 111 ("we never could make a main rotor that would work * * *.") The defendants claim that the failure of the Navy technique was due solely to the device being underpowered and that, had the unit been sufficiently powered, it would have worked as well as Zimmern's. See Defendants' Memorandum, pp. 14–15. How one could know such to be the case without trying it is not explained. Indeed, despite the defendants' contrary representation, Boblitt testified that he was unsure whether the cause of the Navy's technique not working was because it was underpowered or because the tool was "deflecting." Boblitt Tr. 112. Zimmern's machine tool includes a tool mount specifically designed to avoid the latter problem. Thus, it cannot reasonably be concluded that the possible disclosure to Aquino of information concerning the Navy's gear-hobbing technique extinguishes Zimmern's manufacturing proprietorship.

60. The defendants' account of the alleged repositories of knowledge concerning the trade secrets is worth repeating verbatim:
 "1. *Many* allegedly secret techniques are commonly known to and used by the compressor industry and are available to reasonably skilled engineers.
 "2. *Some* of the alleged secret information (such as the tolerances and clearances) are industry standards.
 "3. *Other* supposedly secret information has been disclosed in error without restriction.
 "4. *Much* of the allegedly secret technology has been relinquished by Plaintiffs upon the issuance of Plaintiff Zimmern's patent.
 "5. *Substantially all* of the Plaintiffs' information said to be confidential has been reverse engineered and disclosed by the Navy to the public.
 "6. The allegedly secret combination is at best nothing more than a mere mechanical advance." Defendants' Memorandum, pp. 9–10.

61. There is "ancient" authorative material re hobbing processes and other gear-cutting techniques. See Lionel S. Marks, *Mechanical Engineers' Handbook* (Fourth Edition, 1941), pp. 1833–1835. For example and quoting therefrom:

 "The four principles of action of gear-cutting machines are as follows:
 1. The formed-tool principle, using a tool or cutter shaped to the tooth space.

 * * * * * *

 4. The generating principle, in which a tool with a cross section differing from the desired shape of the tooth is moved in such a relation to the gear to be generated that the proper shape of tooth results.
 "Machines using method 1 produce spur, spiral, helical, and worm gears; * * * and 4, spur, helical, bevel, spiral and hypoid bevel and worm gears." Id. at 1833–1834.

The defendants claim that the Navy released other information that Zimmern claims as trade secrets. For instance, they claim that a Navy handout distributed at a pre-bid conference in March 1982 "clearly identifies the clearances used in the single-screw compressor fabricated by Plaintiffs' licensee, Chicago Pneumatic." Defendants' Memorandum, p. 27. In fact, the referenced document reveals only two clearances, "radial clearance" and "gaterotor tooth clearances," and they are expressed in terms of ranges from three to five and two to five thousandths of an inch, respectively. Among the other Navy releases deemed significant by the defendants are an unadduced article entitled "Navy Air Compressor: Past Present and Future," Bein's previously-discussed thesis and a 1982 article by Navy engineer Harry Skruch entitled "Progress Toward the Development of High Pressure Oil–Free Rotary Air Compressors," which deals predominantly with the bearings in single-screw compressors. *See* Defendants' Exh. 157.

The defendants claim that "some" of Zimmern's claimed trade secrets are "common engineering principles" and that others, including tolerances and clearances, are industry standards. For instance the defendants assert that use of a [Redacted] [61a] process for manufacturing is a "common engineering principle." Defendants' Memorandum, p. 17. The assertion does little to explain why a [Redacted] process is preferable to a milling process or some other method for manufacturing the main rotor of a single-screw compressor. The defendants argue that the clearances and tolerances used in Zimmern's compressor design are "industry standards." In single-screw compressors, however, Zimmern *is* the industry. If the reference to industry standards is taken to mean the compressor industry as a whole, the defendants fare no better, because the tolerance achievable on a given part is intimately tied to the manufacturing method used to create that part. Thus, that a statement such as "the tolerance of one thousandth inch (.001″) * * * is common knowledge within the industry for precision compressors and * * * represents industry standards"—Defendants' Memorandum, p. 24—is of no moment; rather, the particular tolerances achievable in a single-screw compressor created by using an optimal manufacturing technique comprise the critical data. See Aquino (3/26/91) 410–411. Zimmern developed his tolerances by extensive trial-and-error testing. Aquino received the tolerances he used on the Star compressor from Zimmern. *Id.* at 410–411, 418.

The defendants point to two patents that they claim reveal "much" of Zimmern's secret technology. The first is United States Patent No. 2,603,412, entitled "Fluid Motor or Compressor," issued to Ronald Chilton July 15, 1952. Defendants' Exh. 254 ("the Chilton Patent"). Such patent describes a manufacturing method for the main rotor of a single-screw compressor—Zimmern (3/18/91) 407—which has several aspects in common with Zimmern's method.[62] Nevertheless, Zimmern's testimony was undisputed that Chilton's patent was merely a "paper patent" describing a process that has not—and could not—be used to successfully produce a commercially-viable screw because it embodied a mistake that Zimmern had remedied. Zimmern (3/22/91) 55; Zimmern (3/18/91) 406. The second patent upon which the defendants rely is United States Patent No. 3,932,077 issued to Zimmern January 13, 1976 for rotary interengaging worm and worm wheel with specific tooth shape ("Zimmern's Patent"). Plaintiffs' Exh. 251. It describes a milling process for manufacturing a screw and makes a negative reference to the scraping process described in the Chilton Patent, the disadvantages of which the patented milling process was intended to overcome.[63] Zimmern's Patent contains a prior

---

**61a.** See footnote 69, *infra.*

**62.** The Chilton Patent describes a method using a single-point tool with a fixed axis of rotation which is expanded or incremented into the workpiece being cut. Zimmern (3/18/91) 408.

**63.** The paragraph beginning at line 43 of column 2 of Zimmern's patent states:

"Furthermore, machining of the rotor threads can be carried out in accordance with [the British version of the Chilton Patent] only by means of a tool which does not rotate about its own axis and this prevents the possibility of machining by grinding as well as the use of materials which have a high degree of hardness. This results in a lower standard of preci-

art drawing of a gaterotor with a contact line that would be used in conjunction with a screw manufactured by the scraping process described in the Chilton Patent. However, Zimmern's Patent goes on to recommend instead the use of gaterotors with curved flanks with a screw manufactured by a milling process. From the Chilton Patent and Zimmern's Patent the defendants would have this Court conclude that "many basic elements" of Zimmern's manufacturing process have been publicly disclosed and, specifically, that the plaintiffs have "repudiated" any claim to secrecy for the [Redacted].[63a] Defendants' Memorandum, pp. 17, 28.

This Court concludes that the two patents do not support the defendants' suggested conclusions. Significantly, the defendants have not explained how an engineer uneducated in Zimmern's processes would be led to the [Redacted] process or the [Redacted] method by studying the patents; indeed, Zimmern's Patent would likely discourage the engineer from using the scraping method described by Chilton. In short, it is only because the defendants have been exposed to Zimmern's method that they have been able to locate public documents that make references, often oblique or disparaging, to elements of Zimmern's secret manufacturing method.

█ On this very point and in an effort to shore up their public domain argument, the defendants assert that they should not be required to prove actual reliance on the information which they claim was publicly available. In their eyes, it is enough if they can presently reconstruct the plaintiffs' trade secrets from public information upon which they theoretically could have relied.[64] *See* Defendants' Memorandum, pp. 45–48. Such is not the nature of trade secret law, as explained in *Franke v. Wiltschek*, 209 F.2d 493, 495–496 (2d Cir.1953). Therein, the defendants, having been exposed in confidence to the plaintiffs' process for manufacturing a compressed face cloth in a pellet form which when immersed in water opened to its full shape, "resolved to copy the product and market it for their own profit." *Id.* at 494. The United States Court of Appeals for the Second Circuit rejected those defendants' argument that the heart of the plaintiffs' manufacturing process was revealed by an expired patent and that the improvements thereon were mere applications of mechanical skill, holding:

> "[Such argument] totally misconceives the nature of the plaintiffs' right. Plaintiffs do not assert, indeed cannot assert, a property right in their development such as would entitle them to exclusive enjoyment against the world. Theirs is not a patent, but a trade secret. The essence of their action is not infringement, but breach of faith. It matters not that defendants could have gained their knowledge from a study of the expired patent and plaintiffs' publicly marketed product. The fact is that they did not. Instead they gained it from plaintiffs via their confidential relationship, and in so doing incurred a duty not to use it to plaintiffs' detriment. This duty they have breached." *Id.* at 495.

The defendants argue that the plaintiffs have waived application of the rule stated in *Franke v. Wiltschek* by excluding, from the definition of their Know–How, information which

"a. is in the public domain or becomes publicly known through no wrongful act on the part of McGRAW–EDISON; or

"b. can be proven to have been already known to McGRAW–EDISON at the time of disclosure to it; or

"c. is rightfully received by McGRAW–EDISON from a third party who obtained such information lawfully without any obligation of confidence directly or indirectly to MONOVIS,

sion in machining and lower quality of the state of surface of rotor threads than is achieved by the grinding process.
 "The primary object of the invention is to overcome the disadvantages mentioned in the foregoing." Plaintiffs' Exh. 251.

**63a.** See footnote 69, *infra*.

**64.** At the same time, the defendants persist in their position that they actually acquired their technology from the public domain. Defendants' Memorandum, p. 48.

ZIMMERN, [SSCI], * * * or OMPHALE * * *." Plaintiffs' Exh. 238 (Aquino Confidentiality Agreement), p. 2; *also* Plaintiffs' Exh. 296, p. 5. *See* footnote 39, *supra.*

They thus argue, for example, that because the Chilton Patent is "in the public domain," Zimmern cannot claim as a trade secret any aspect which his manufacturing method has in common with that discussed in such patent. This argument is premised on an overly restrictive view of trade secret protection which this Court rejects. It is, as earlier noted, only because of Aquino's confidential relationship with Zimmern (and the litigation its breach has generated) that the defendants are now able to select particular items from a vast sea of public information and contend that they "could" have divined therefrom the needed critical information; such is the very approach rejected in *Franke v. Wiltschek, supra.* Items such as the Chilton Patent were publicly available, but were by no means obvious; they were not accompanied by instructions explaining where they were useful and where they were not, or what particular elements they described were relevant and helpful and which were not, or indeed why they should be selected over some other publicly available information. It is this type of knowledge which is the heart of Zimmern's Know-How.

■ The defendants have advanced a further argument aimed at limiting the scope of the information Aquino agreed to hold confidential and point to a discrepancy between the language and punctuation of the License Agreement entered into between Worthington and Zimmern and the wording of the Letter Agreement signed by Aquino. *See* Plaintiffs' Exhs. 296, 238. Preliminarily, it should be noted that both of such agreements contain identical, broad definitions of the plaintiffs' "Know-How" to be held in confidence:

"All drawings, specifications, calculations, technical information or other data relating to SSC's, including their capacity control, to the processes for machining, checking, assembling and testing them, to the special machines or tooling for manufacturing them, or to any IMPROVE-

MENT known to or in the possession of MONOVIS which MONOVIS may have or acquire the right to dispose of during the life of this AGREEMENT." Plaintiffs' Exh. 238, p. 1; *see also* Plaintiffs' Exh. 296, p. 4.

Such provision is printed on the first page of the Letter Agreement signed by Aquino. The second page of the Letter Agreement includes a paragraph which begins:

"More particularly, tolerances of screws, gaterotors and casings, and dimensions that would suggest methods for manufacturing screws, gaterotors or casings shall not be disclosed to third parties * * *." Plaintiffs' Exh. 238, p. 2.

The parallel provision in the License Agreement reads:

"McGRAW-EDISON shall in particular not disclose to third parties tolerances of screws, gaterotors and casings; nor shall McGRAW-EDISON disclose dimensions that would suggest manufacturing methods for screws, gaterotors or casings." Plaintiffs' Exh. 296, p. 16.

The defendants urge that "[t]he only logical interpretation of the clause in Aquino's Letter Agreement is that it is only dimensions and tolerances which *suggest methods* of manufacturing that are to be protected." Defendants' Reply Memorandum, p. 38. Inasmuch as the plaintiffs admit that there probably are no tolerances which reveal manufacturing techniques—*see* Plaintiffs' Memorandum, p. 66—, the defendants' analysis of the Letter Agreement leads to their conclusion that Aquino was not required to keep tolerances confidential. Viewed by itself and from a very technical perspective, the above-quoted clause in Aquino's Letter Agreement is capable of more than one interpretation. The one advocated by the defendants is that only tolerances and dimensions that suggest manufacturing methods are protected. A second interpretation—which in this Court's opinion is no less logical than that urged by the defendants—is that tolerances of screws, gaterotors and casings are protected, and dimensions that suggest manufacturing methods are protected.

In any event, the defendants assert that the Letter Agreement contains an ambiguity

which should be construed in their favor under the doctrine of *contra proferentem.* "The well settled doctrine of *contra-proferentum* [sic] holds that ambiguities in non-negotiated or adhesion contracts are to be construed against the profferer," the defendants argue. Defendants' Reply Memorandum, p. 39. Leaving aside whether the Letter Agreement is non-negotiated or adhesion, it is noteworthy that the cases cited by the defendants lie in the insurance claim field wherein social considerations persuade in favor of coverage where the insurer's own language is ambiguous. One cited decision from the Civil Court of the City of New York, Queens Co., does state that "[n]umerous cases have applied the doctrine of 'contra proferentum' [sic] to failures to define terms of the [insurance] policy. This doctrine holds that ambiguity in non-negotiated or adhesion contracts are [sic] to be construed against the profferer, here the insurer." *Citron v. Hartford Acc. & Indem. Co.,* 86 Misc.2d 26, 381 N.Y.S.2d 650, 651 (1976). Earlier the United States Court of Appeals for the Second Circuit cited "the *rubric* of insurance law that any ambiguity in the construction of a policy will be resolved against the insurer." [*Emphasis added.*] *Ore & Chemical Corp. v. Eagle Star Insurance Co., Ltd.,* 489 F.2d 455, 457 (2nd Cir.1973). Such basic erudition is not, however, to be ignored. One sees the term—*contra proferentem*—in Black's Law Dictionary (Revised Fourth Edition, 1968). (It seems not to have survived to gain inclusion in Black's Law Dictionary (Sixth Edition, 1990)). Black, in 1968, defined the term as "[a]gainst the party who proffers or puts forward a thing. *J. Zimmern's Co. v. Granade,* 212 Ala. 172, 102 So. 210, 211." Black portrays *contra proferentem* as part of a longer and helpful sentence: *verba chartarum fortius accipiunter contra proferentem* which Black defines or translates as meaning "[t]he words of charters are to be received more strongly against the grantor (or the person offering them)" and cites back to *The Law of Contracts* by Parsons. As to this rule Parsons, at pages 653–654 in volume 2 (1873), says:

"The reason of the rule '*contra proferentem* ' is that men may be supposed to take care of themselves; and that he who gives, and chooses the words by which he gives, ought to be held to a strict interpretation of them, rather than he who only accepts. But the reason is not a very strong one, nor is the rule of special value. It is indeed often spoken of as one not to be favored or applied, unless other principles of interpretation fail to decide a question."

It should be

"the last to be resorted to, and is never to be relied upon but where all other rules of exposition of words fail." *Id.* at fn. (p). "This rule of construction is not properly applicable to any case, but one of strict *equivocation,* where the words used will bear either one of two or more interpretations equally well. In such a case if there be no other legitimate mode of determining the equipoise, this rule might well enough decide the case. In all other cases, where this rule of construction is dragged in by way of argument,—and that is almost always where it happens to fall on the side which we desire to support,—it is used as a mere makeweight, and is rather an argument than a reason." *Ibid.*

Again in the text (at page 657): "This rule, that words shall be construed '*contra proferentem,* ' * * * is among those principles of interpretation which have the least influence or value." Legal logic decries applying such definition literally. One who "proffers or puts forward a thing" could mean the person or entity who or which was now holding the "thing" out as something to be relied upon—as, perhaps, an item of evidence in a courtroom—but that is not the reason for or the sense behind the defendants' citing of the "rule." They propose, logically, that, if one person's ambiguous language is used in a contract and the interpretation of the words has some criticality—which they do not have in this instance—in a dispute between that person and another who has acquiesced in or been compelled to accept the words, the latter is entitled to have the ambiguity resolved against him whose words they were. And the truth of this is seen from the cited Ala-

bama case.[65] *J. Zimmern's Co. v. Granade* (1924) is, as noted above, cited in Black in support of his definition. That case was a simple one which concerned the validity of a guarantee given by a corporate president to a vendor (Zimmern's) for food grains to be delivered to the corporation at a particular address where the corporation's facilities soon thereafter were destroyed by fire. Resultantly, Zimmern's delivered the food grain to the corporation at another address. There came a time, after a number of years, when Zimmern's Co.'s bills weren't being paid by the corporation so the provider sought to recover from the defendant-guarantor who endeavored to weasel out of his asserted obligation because of the different delivery address. Because it had been his own letter and verbiage by which the guarantee had been given and upon which Zimmern's had relied, the Supreme Court of Alabama had little difficulty in holding the defendant-president responsible. *J. Zimmern's Co.* cites in support of its proclamation re *contra proferentem* three earlier decisions of the Supreme Court of Alabama— *Seay v. McCormick,* 68 Ala. 549 (1881), *Comer v. Bankhead,* 70 Ala. 136 (1881), and *Ashby v. Cathcart,* 159 Ala. 474, 49 So. 75 (1909). *Comer,* at 141, cites 2 Parsons's *The Law of Contracts* (Sixth Edition 1873) for the rule that the whole contract should be considered in determining the meaning of any or all of its parts and, again, for a slightly better exposition of *contra proferentem*—to wit, that all instruments should be construed against him to gives or undertakes or enters into an obligation. *Seay,* at 550, has the same exposition of *contra proferentem* but then throws out to us the longer and more-pertinent Latin maxim *ut res magis valeat quam pereat* which the Fourth Edition of Black's Law Dictionary, with a back-reference to Parsons, tells us means "that the thing may rather have effect than be destroyed." *Comer,* at 141, imparts a similar maxim that a contractual writing—the "thing"—shall be construed, where possible, "in such a way as to give force and validity to all" of its parts.

Consequently, this Court disagrees with the defendants' suggested rule of construction. The particularization on the second page of the Letter Agreement of information not to be disclosed must be read in conjunction with the first page's expansive statement of protected items, including "[a]ll drawings, specifications, calculations, technical information [and] other data relating to SSC's * * *." The latter is not limited by the former, particularly where a somewhat tortured definition of the second page is required to achieve such limitation.[66]

■ Even had the defendants succeeded in proving that all of the individual elements of information relating to Zimmern's single-screw technology were "out there" in the public domain, they would still have had to explain why the synergistic combination of such elements into a unified whole, capable of producing working and commercially-feasible single-screw compressors, should not be afforded trade secret protection. The United States Court of Appeals for the Second Circuit has recognized that a "trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and

---

65. With such a coincidental identity between its party's name and our co-plaintiff's, one can't stop short of examining it.

66. As the plaintiffs point out, acceptance of the defendants' construction entails a finding that the drafter of the Letter Agreement intended to protect only tolerances which reveal manufacturing methods, which is unlikely because there probably are not any such tolerances. Where possible, contracts should not be read so as to render any provision meaningless. In addition, despite the defendants' apparent position that the slight differences in language between the Letter Agreement and the License Agreement must be read as revealing an intent to narrow the scope of confidentiality imposed by the Letter Agreement, this Court finds the language of the License Agreement instructive as to the intended meaning of the Letter Agreement and supportive of the interpretation urged by the plaintiffs. However, consideration of the License Agreement's language is unnecessary to this Court's finding that the Letter Agreement is unambiguous on the whole.

is a protectable secret." [67] *Imperial Chem. Indus. Ltd. v. National Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965) (quoted from and relied upon in *Integrated Cash Mgmt. Serv. v. Digital Transactions*, 920 F.2d at 174). Zimmern's knowledge of single-screw compressors qualifies for trade secret protection in this manner. At the broadest level, Zimmern's Know–How serves as a guide, charting the way through the many problems and decisions faced in designing a single-screw compressor and developing a practical manufacturing technique. At each step along the way, Zimmern identifies the problems and possible solutions and endeavors to explain the best way to proceed. To date, Zimmern and his licensees are alone in having successfully maneuvered the entire course and achieved commercially-viable single-screw compressors. Such knowledge is clearly valuable and should be protected from wrongful misappropriation by those exposed to it under a duty of confidence.

■ This Court now examines the proof of misappropriation by the defendants. As has been noted in a past case:

> "Plaintiffs in trade secret cases, who must prove by a fair preponderance of the evidence disclosure to third parties and use of the trade secret by the third parties, are confronted with an extraordinarily difficult task. Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything. This is such a case." *Greenberg v. Croydon Plastics Co. Inc.*, 378 F.Supp. 806, 814 (E.D.Pa.1974).

This, too, is a case in which the defendants have taken a "deny everything" approach to the litigation, but here the circumstantial evidence against them is anything but ambiguous or delicate. The circumstances of ATC's speedy coming of age in the single-screw compressor marketplace weigh decidedly in favor of the inference that they misappropriated the plaintiffs' trade secrets. As discussed at length hereinabove, groundwork was being laid for ATC's single-screw compressor while both Aquino and Choroszylow were employed by Dresser–Rand. Once those ties were severed—and to some extent even earlier—, ATC immediately held itself out as having expertise in single-screw compressor technology and the ability to provide functional designs and machining methods. The most significant of ATC's overtures was to Cooper and resulted in the award of a lucrative contract for ATC to provide single-screw technology. While Aquino claims to have not even conceived of his single-screw manufacturing method until he started at ATC in early November 1987, the Cooper–ATC contract for the sale of machine process and design technology is dated November 10, 1987. Plaintiffs' Exh. 67.[68] In the face of Zimmern's efforts over many years to create working single-screw technology, the defendants' immediate promise to provide "a quick response to the commercial 'window'" (Plaintiffs' Exh. 54) perceived by Cooper is strong circumstantial evidence of misappropriation.

A comparison of the plaintiffs' and the defendants' manufacturing techniques and single-screw compressor designs provides further proof, of a highly technical nature, that the defendants have engaged in misappropriation. Beginning with the method used to fabricate the rotor, this Court is persuaded that the elements of Zimmern's process—the only method ever devised to cut screws accurately and quickly enough to be commercially-viable—have been appropriated by the defendants. In their brief, the plaintiffs identify the "four central trade secrets

---

**67.** No express mention is made of synergism but such might well be an implied requirement of the combination.

**68.** The contract was subsequently executed by Choroszylow for ATC and by Nishan Teshoian for Cooper in May 1988. The contract price for a machine tool and a compressor design was $330,000. Plaintiffs' Exh. 67, schedule B.

embodied in Zimmern's screw manufacturing process"—[Redacted]. Plaintiffs' Memorandum, 114–118. Aquino's main rotor manufacturing method is remarkably similar in these areas. [Redacted] [69]

[Redacted] Aquino was, of course, exposed to Zimmern's method for manufacturing gaterotors and it is reasonable to infer that Aquino understood the relationship between screw and gaterotor manufacturing. [Redacted]

The plaintiffs do not contend that Aquino copied Zimmern's machine tool in all particulars; obviously, he did not.[70] Rather, they contend that Aquino derived his method from Zimmern's, that he used Zimmern as a springboard to launch his own approach. That such was in fact the case is supported by Wehber's testimony that, while at Dresser–Rand, Aquino explained a new screw manufacturing method he had devised to "get around" Zimmern's Know–How. Wehber (8/30/91) 39. Further support can be derived from the notes and correspondence surrounding ATC's deal with Cooper—the parties involved were apparently less concerned with the possibility that Aquino might misappropriate Zimmern's manufacturing technique than they were with ensuring that they would not be taken to task for any misappropriation in which Aquino had engaged. Thus, the emphasis was on whether Aquino's proposal was a recognizable derivative of Zimmern's process. For example, the first topic listed for discussion in Coleman's notes

of the October 27, 1987 meeting was "Uniqueness (vs. Zimmern) if any."

Turning to the subject of gaterotor manufacture, Zimmern has developed two methods for making the flanks on the gaterotor teeth. [Redacted]. Aquino had access to both methods in the course of his confidential relationship with Zimmern,[71] and chose to use the [Redacted] method in ATC's work.[72] [Redacted].[73] [Redacted] Also, Aquino admitted that the fixture he presently uses is a derivation of the fixture Dooley used to make Worthington's gaterotors for the Star compressor. *Id.* at 766. In fact, Worthington provided Dooley with detailed drawing of a gaterotor to enable him to build such a fixture. *Id.* at 766–768. Hence, in addition to the similarities of Zimmern's and the defendants' fixtures, there is a clear ancestral link between the defendants' fixture and the plaintiffs' proprietary design information and the gaterotor fixture developed by Dresser–Rand for the Star Project.

On the subject of single-screw compressor design, there are marked similarities between the design Aquino claims as his own and Zimmern's design.[74] The evidence pertaining thereto is technical but nonetheless probative on the issue of misappropriation. *See* Plaintiffs' Memorandum, pp. 135–149. By way of example, the wrapping angle[75] used by Zimmern is [Redacted] degrees. ATC's "Globoid Compressor Design Manual" lists a "main rotor engagement angle" of [Redacted] degrees, virtually identical to the number used by Zimmern. Zimmern

---

69. Certain portions of the original Findings of Fact, Conclusions of Law and Order expose specifics of the plaintiff's claimed trade secrets. Such have been deleted for publication purposes at places so indicated and such deletions are indicated by "[Redacted]." The whole of the original footnote has been deleted and the foregoing substituted.

70. [Redacted].

71. Plaintiffs' Exh. 258B is Aquino's signed acknowledgment of information disclosed to him in Paris in March, 1984. The sixth listed item is "Page 148 of know-how, drawing improved" and pertains to the [Redacted] method of gaterotor manufacture. Aquino admitted seeing Zimmern's fixture used in such process in Paris. Aquino (3/28/91) 769. The Know–How book also

describes the [Redacted] method of gaterotor manufacture.

72. [Redacted].

73. The process is more fully described at page 128 of the Plaintiffs' Memorandum. A gaterotor machining fixture of this type was received in evidence as Plaintiffs' Exh. 1026.

74. In addition, there is a wealth of evidence of similarities between "Aquino's" design and the design of Worthington's Star compressor.

75. The wrapping angle refers to the number of degrees the main rotor rotates from the time that a particular gate rotor tooth enters a groove to the time that tooth exits the groove. Zimmern (3/14/91) 656.

(3/14/91) 667.[76] The plaintiffs further point to two "critical differences" in their design that they claim have been appropriated—[Redacted].

[Redacted] [77]

[Redacted] [78]

■ Two further arguments advanced by the defendants should be addressed. The first is that the plaintiffs' trade secrets were somehow extinguished after Worthington mistakenly released to the Navy a package of drawings containing information on tolerances and clearances,[79] which allegedly had been released by the Navy to the public. See Defendants' Memorandum, pp. 20–23, 30–32. The argument fails for various reasons. First, it is the defendants' position in this litigation that Aquino had designed a single-screw compressor long before the release of the information to the Navy; thus, they cannot claim the alleged publication by the Navy as the source of their knowledge. Second, Aquino himself was responsible for checking some of the drawings in question before they were released to the Navy—*see, e.g.,* Zimmern (3/13/91) 526—and to allow him to leak secret information and thereafter assert such as a defense to misappropriation would be most inequitable. *See, e.g., Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 683 (7th Cir.1983) ("a wrongdoer who has made an unlawful disclosure of another's trade secrets cannot assert that publication to escape the protection of trade secret law"). Third, the evidence does not support either the conclusion that the dissemination of the drawings by the Navy was so widespread or that the nature of the information they contain was such as to extinguish Zimmern's trade secrets. As the plaintiffs cogently observe, the best proof that Zimmern's trade secrets survived is that Rix Industries, a company which received the drawings, subsequently obtained a Zimmern license. Plaintiffs' Reply Memorandum, p. 13.

The other argument advanced by the defendants is that the plaintiffs have been dilatory in prosecuting their request for injunctive relief and are barred from recovery by the doctrine of laches. Defendants' Memorandum, pp. 60–71. This Court has found that plaintiffs to have been zealous in their efforts to protect their trade secrets and accordingly finds the defendants' arguments in this regard to be without merit.

Having found the defendants guilty of misappropriating the plaintiffs' single-screw compressor trade secrets, this Court is not compelled to discuss at length a further and meritorious basis for relief against the defendants—to wit, that the proof showed that much of the work Aquino claims as his own was conducted while he was either employed by or consulting with plaintiff-intervenor, Dresser–Rand. For instance, while the proof does not support defendants' contention that Aquino had designed a single-screw compressor before receipt of any of the plaintiffs' Know–How, Dresser–Rand would have a valid claim to any such design under the Agreement for Assignment of Inventions executed by Aquino in July of 1965. See Plaintiffs' Exh. 8. In like manner, the evidence showed that Aquino initially conceived his manufacturing technique while still either employed by or consulting with Dresser–Rand; even if such manufacturing technique had not been derived from the plaintiffs, it would nevertheless belong to Dresser–Rand and not the defendants, under either the Agreement for the Assignment of Inventions or the Consultant Agreement. *See* Plaintiffs' Exh. 8; Plaintiffs' Exh. 28, ¶ 9. But, again, in light of the findings hereinabove of trade secret misappropriation, such analysis is un-

---

76. In the absence of any objection from the defendants in their reply papers, this Court accepts the plaintiffs' implied position that "main rotor engagement angle" is synonymous with "wrapping angle."

77. [Redacted]

78. [Redacted]

79. Zimmern and the Navy had entered into an agreement limiting the information Zimmern's licensee would reveal to the Navy in connection with the Star Project. In this regard, drawings released to the Navy were to have certain information on tolerances and clearances redacted. The Navy would instead be provided with a "master" screw and gaterotor it could use to inspect parts delivered to it. *See* Plaintiffs' Exhs. 233A, 234.

necessary to grant relief against the defendants.

This Court now turns to a consideration of the appropriate remedies for the defendants' trade secret misappropriation. The requested relief is wholly equitable; no monetary damages are sought. The plaintiffs (and plaintiff-intervenor) seek a permanent injunction against the use and disclosure of their trade secrets, an injunction preventing the defendants from competing in the single-screw compressor field, an assignment of any and all patents and patent applications of the defendants pertaining to single-screw compressor machine tools, and an order directing the defendants "to deliver all machine tools, fixtures and tooling and checking devices for cutting screws, machining of gaterotors and machining of any special tools either to Zimmern or [Dresser–Rand]." Plaintiffs' Memorandum, p. 27. The requests will be dealt with *seriatim.*

 The plaintiffs seek a permanent injunction against use and disclosure of their trade secrets. In order to obtain permanent injunctive relief, a party must, of course, prevail on the merits of its claim. As a general proposition, it must also demonstrate the absence of an adequate remedy at law and that irreparable harm will be suffered in the absence of an injunction—*N.Y. State Nat. Organization for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989)—but irreparability of the harm is presumed in cases of trade secret misappropriation. *See, e.g., FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.,* 730 F.2d 61, 63 (2d Cir.1984) ("it is clear that the loss of trade secrets cannot be measured in money damages. * * * A trade secret once lost is, of course, lost forever.") This Court finds appropriate a permanent injunction against the defendants' use and disclosure of the plaintiffs' trade secrets. Aquino received trade secret information as a result of his employment with Worthington and later with Dresser–Rand and agreed to hold such in confidence. Instead, Choroszylow and he set up a business which freely

and purposefully set about disclosing and selling the very things Aquino had promised not to reveal. Obviously, in such a situation, equity commands that the defendants be enjoined from further use and disclosure of the misappropriated material.

 An injunction against use and disclosure alone would be insufficient to achieve the requisite equity in this case. Instead, the defendants must be enjoined from competing in the single-screw compressor marketplace. The reasons for such conclusion are several. First, even assuming the best of good faith, it is doubtful whether Aquino could completely divorce his knowledge of the trade secrets from any single-screw compressor work in which he might engage. Past cases have recognized the potential difficulty an enjoined party would face in not using or disclosing secret information as justifying injunctions prohibiting such party from working in the area to which the secrets relate. *See, e.g., FMC Corp. v. Varco Intern., Inc.,* 677 F.2d 500, 504 (5th Cir.1982) ("Even assuming the best of good faith, Witt [FMC's former employee] will have difficulty preventing his knowledge of FMC's 'Longsweep' manufacturing techniques from infiltrating his work."); *Allis–Chalmers Mfg. Co. v. Continental Aviation & Eng. Co.,* 255 F.Supp. 645, 654 (E.D.Mich.1966) ("The virtual impossibility of [plaintiff's former employee and defendant's present employee] Mr. Wolff performing all of his prospective duties for Continental to the best of his ability, without in effect giving it the benefit of Allis–Chalmers's confidential information, makes a simple injunction against disclosure and use of this information inadequate."). Second, there is much to cause this Court to question whether the defendants would in good faith act to avoid using and disclosing information belonging to others; the record in this case suggests the opposite. The defendants have repeatedly chosen to interpret Aquino's obligations in a begrudgingly narrow sense, violating both their letter and spirit.[80] Instead of respecting Aquino's

**80.** In addition to the defendants' arguments based on the wording of Aquino's Letter Agreement discussed and rejected hereinabove, there was evidently a consensus among the partici-

pants at the August 14, 1987 meeting at Cooper that the obligations imposed by the Letter Agreement lasted only during the period of employment. In the Defendants' Reply Memorandum,

duties to Dresser–Rand and the plaintiffs, or even making a good-faith inquiry into the nature and extent thereof, the defendants advertised their arrival on the single-screw compressor market using Aquino's work on the Star Project as a selling point to drum up business.[81]

Furthermore, the defendants' approach to this litigation does little to inspire confidence that they can be relied upon not to use and/or disclose the plaintiffs' trade secrets if they were to be permitted to continue in the single-screw compressor field. The defendants would have to be trusted to a large extent to police themselves if they were enjoined only from use and disclosure; both Aquino and Choroszylow stated that the use of certain trade secrets related to single-screw compressors would be difficult or even impossible to detect. *See* Aquino (3/27/91) 465; Plaintiffs' Exh. 79A (Affidavit sworn to by Choroszylow November 3, 1989), ¶¶ 3, 4(g). Choroszylow later tried to lessen such impact of his affidavit, stating that the affidavit was intended to be "more of a needle in the side than anything else * * * a jab, I guess." Choroszylow (9/13/91) 32. In essence, Choroszylow thus admitted that the truth of his testimony might be related to the purpose for which it is given. Such attitude is emblematic of the defendants' absolute refusal to concede a single point in this litigation, even when documentary evidence proved them wrong. The major ultimate effects of such strategy were to prolong the litigation and to undermine the defendants' own credibility.

The foregoing and an additional incident convince this Court that the defendants could not be counted on to comply faithfully with an injunction prohibiting only use and disclosure. Subsequent to the commencement of this action, the defendants were ordered to withdraw a patent application on a mainrotor machining technique they had filed with the United States Patent Office. Order of Hon Richard J. Arcara (dated September 20, 1990). The plaintiffs and plaintiff-intervenor sought and were granted such Order on the grounds that it was necessary to prevent the revelation of their proprietary information relating to single-screw manufacturing techniques. Despite the presence of the Order directing withdrawal of their patent application, the defendants proceeded with a foreign patent application which revealed the same information. *See* colloquy (3/11/91) 4–17. Inasmuch as this Court has found that Aquino misappropriated the plaintiffs' trade secrets in devising the patented manufacturing technique, the defendants will be ordered to assign any and all patents and patent applications pertaining thereto to Zimmern. *See Richardson v. Suzuki Motor Co., Ltd.,* 868 F.2d 1226, 1249–1250 (Fed.Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989), and cases cited therein.

Such disregard for the plaintiffs' claimed trade secrets—even though at the time they were only claims—counsels in favor of minimizing the risk of any further use and disclosure of the same by all available means. This Court will accordingly permanently en-

they continue to contend that "[i]t was natural to question the meaning of the letter agreement since it was drafted in such a fashion that a lay person could assume that their [sic] obligations existed *only as an employee*." *Id.,* at 50. They claim that such assumption naturally follows from the following language of the Letter Agreement:

"McGraw–Edison has undertaken an obligation, which you as an employee will be expected to fulfill, with respect to [the plaintiffs'] KNOW–HOW * * *." Plaintiffs' Exh. 238.

To read such sentence out of context and conclude that the obligations imposed on employees by the Letter Agreement terminate at the end of employment stretches the agreement beyond its breaking point.

**81.** One of the examples is Choroszylow's June 24, 1988 letter to the Director of Commercial

Compressor Engineering at UTC–Carrier in Syracuse, N.Y. He wrote:

"With regard to Single Screw compressor technology, we feel we're in the unique position of being able to offer documented experience in the *design, fabrication and testing* of single screw compressors, which have gone on to achieve successful long term operation. This experience encompasses specialized Naval compressors now entering production, and proprietary commercial compressors now under development." Plaintiffs' Exh. 89.

To the letter, Choroszylow attached a copy of Aquino's resume, which prominently stated that Aquino was "[r]esponsible for the technical development of the Worthington STAR Compressor."

join the defendants from not only using and disclosing the plaintiffs' trade secrets, but also from competing in the market for single-screw compressor technology and products. The ban on competition will be permanent; a "headstart" injunction is inappropriate as this Court finds persuasive reasons to doubt that the defendants ever would have successfully developed, or even endeavored to develop, a working body of single-screw compressor technology but for Aquino's employment with Worthington and consequent exposure to Zimmern's trade secrets.

Accordingly, it is hereby **ORDERED** that the defendants are and each of them is enjoined permanently from the use and/or disclosure of any and all of the plaintiffs' trade secrets and from engaging in any manner or to any degree in the manufacturing or other business attending or involving single-screw compressors or their technology; and it is hereby further

**ORDERED** to cause to be delivered to the plaintiffs or to their designee all machine tools, fixtures and tooling and checking devices for cutting screws, machining of gaterotors and machining of any special tools; and it is hereby further

**ORDERED** to assign and transfer to the plaintiffs, without monetary or other consideration therefor, each and every patent issued to the defendants or either of them in and by any country other than the United States and each and every application therefor, which patent or application embodies single-screw compressor technology.